FIRST JUDICIAL DISTRICT DEPART-
MENT OF CORRECTIONAL
SERVICES, Appellee,

v.

IOWA CIVIL RIGHTS COMMISSION,
Appellant.

No. 65774.

Supreme Court of Iowa.

Jan. 20, 1982.

Thomas J. Miller, Atty. Gen., and Scott H. Nichols, Asst. Atty. Gen., for appellant.

David J. Dutton and James R. Hellman of Mosier, Thomas, Beatty, Dutton, Braun & Staack, Waterloo, for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, McGIVERIN, and SCHULTZ, JJ.

UHLENHOPP, Justice.

In this appeal we determine whether an employee was the victim of discrimination and whether a state agency could be held liable as a claimed successor employer for the discriminatory act of its predecessor.

Mary Berdell is a blind, black woman living in Waterloo, Iowa. She is a trained counselor, having completed post graduate studies in education and psychology at Drake University and received a master's degree in social work from the University of California at Los Angeles. She was employed by the Black Hawk Department of Court Services (BHDCS) as a part-time pretrial release interviewer and counselor from October 15, 1974, until her resignation on January 4, 1975. During that period she was a probationary employee. BHDCS was established in 1973 under a federal grant entitled "Project Link-up" which was administered by the Northeast Iowa Crime Commission. The purpose of BHDCS was to establish a system of community-based corrections in the Waterloo area under which the population of the city and county jails could be reduced by permitting pretrial release on the prisoner's own recognizance or under the supervision of BHDCS.

Berdell's duties required her to perform two functions. As a pretrial interviewer she conducted interviews with prisoners incarcerated in the Black Hawk County jail to determine their eligibility for pretrial release. She conducted the interviews in a conference room at the jail. After verifying the information obtained in the interview, she made recommendations to the district court concerning a prisoner's suitability for pretrial release. As a pretrial counselor she provided counseling for the individuals released by the court on supervision and brought them into contact with various social service agencies in the Waterloo area. The counseling sessions were usually conducted at BHDCS offices in the county courthouse.

From the beginning BHDCS experienced difficulties in its relationship with the Black Hawk sheriff's personnel who controlled access to the jail. A major source of tension between BHDCS and the jail staff was Mary Berdell and her visits to the jail. The jail staff believed that she posed a significant security risk because of her blindness.

On January 3, 1975, Keith Burbridge, the director of BHDCS, received another of a continuing series of complaints from the sheriff's personnel alleging that Berdell was refusing to follow jail rules and was being generally uncooperative with the jail staff. The personnel also informed BHDCS that the tension was reaching a serious level and unless Burbridge acted to remedy the situation, access to the jail for all BHDCS personnel would be jeopardized. Burbridge, who was on vacation at the time, spoke with Berdell by telephone and directed her to refrain from interviewing prisoners in the jail. He told her that she posed a security risk as her blindness made her vulnerable to being taken hostage. He also believed that because she was black the repercussions of her being taken hostage would be more serious, given the tense racial climate prevailing in Waterloo at the time. Berdell protested the directive as discriminatory and told Burbridge that she would contact him the following day to inquire whether he had reconsidered the matter.

On January 4, 1975, Burbridge reiterated his decision to restrict Berdell's access to the county jail. Berdell concluded that denial of access would prevent her from effectively performing her duties as a pretrial interviewer. Consequently, she called a press conference and announced her resignation from BHDCS.

Berdell filed a complaint with the Iowa Civil Rights Commission on January 16, 1975, alleging that BHDCS discriminated against her on the basis of her race and disability. The complaint was investigated and a probable cause finding was issued in November 1975. See § 601A.9(3), The Code 1973. A hearing was not held, however, until January 18, 1979.

BHDCS later came to an end; Burbridge, its director, ceased work in October 1975. At some point the First Judicial District Department of Correctional Services (Department) came into existence after the Iowa General Assembly took over community corrections in chapter 156 of the Acts of the 67th General Assembly, 1977 Session.

Following the submission of briefs in the civil rights hearing, the hearing officer amended the complaint to name the Department as respondent in place of BHDCS. The hearing officer proposed a decision and the Commission subsequently adopted it without modification.

In the decision the Commission concluded that BHDCS discriminated against Berdell on the basis of race and disability, that no business necessity existed to justify the discrimination, that Berdell's resignation constituted a constructive discharge, and that Berdell made a good faith attempt to mitigate her damages. The Commission also found that the Department was the direct successor of BHDCS and as such was liable for the discriminatory employment practices of BHDCS under the doctrine of successor liability. It further found that the Department, even as a governmental agency, was liable under section 601A.7(1)(a), The Code 1973. The Commission concluded that Berdell was entitled to $5452.90 in back pay from the Department and to reinstatement in a position equivalent to the part-time counselor position she formerly held.

The Department filed a petition in district court for judicial review of the agency action. See § 601A.10(1), The Code. The court denied a change of venue requested by the Commission. After hearing on the merits, the court reversed the Commission's decision. It found that Burbridge's order restricting Berdell from the county jail was temporary and that the Department was "a stranger to the lawsuit" and could not be held liable for acts of BHDCS. The Commission appealed to this court. See § 601A.10(7), The Code.

On appeal the Commission asserts that the district court (1) abused its discretion in denying the motion for change of venue, (2) erred in considering evidence outside the record as made before the Commission, (3) impermissibly substituted its judgment for that of the Commission on the question of the permanency of Burbridge's order to Berdell, and (4) committed an error of law in determining that the Department could

not be held liable for the act of BHDCS. The Commission also contends its conclusions are correct that Berdell's resignation constituted a constructive discharge, that no business necessity existed for the discharge, and that the complaint could be amended to name the Department as a respondent.

We conclude on the record that a constructive discharge did not occur and that the Department cannot be held liable under the theory of successor liability. Before we turn to these questions we consider our scope of review and the district court's refusal to change the venue.

■ I. *Scope of review.* Our scope of review in the present case is governed by *Linn Co-op Oil Co. v. Quigley*, 305 N.W.2d 729 (Iowa 1981). There the issue was whether the judicial review provisions of the Iowa Administrative Procedure Act (IAPA) applied where the district court was reviewing an Iowa Civil Rights Commission decision in which the complaint was filed prior to July 1, 1975. To answer that question we construed section 17A.23, The Code 1979 (emphasis added):

> The Iowa administrative procedure Act shall be construed broadly to effectuate its purposes. This chapter shall also be construed to apply to all agencies not expressly exempted by this chapter or by another statute specifically referring to this chapter by name; and *except as to proceedings in process on July 1, 1975,* this chapter shall be construed to apply to all covered agency proceedings and all agency action not expressly exempted by this chapter or by another statute specifically referring to this chapter by name.

We held that the filing of a complaint on February 27, 1975, triggered a proceeding that was "in process" when the IAPA became law on July 1, 1975, and therefore under section 17A.23 the provisions of that legislation did not apply to such a controversy. 305 N.W.2d at 732. We further held that since the IAPA judicial review provisions did not apply, the proper scope of review of the courts was de novo under section 601A.10(6), The Code 1973.

Berdell filed her complaint with the Commission on January 16, 1975. Under *Quigley*, the present case is a proceeding "in process on July 1, 1975," and therefore the judicial review provisions of the IAPA are inapplicable and the review of the district court and of this court is de novo. *See Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758, 761 (Iowa 1971).

■ II. *Change of venue.* The Department filed its petition for judicial review in Black Hawk County. *See* 601A.10(2), The Code 1973. The Commission moved for a change of venue to Polk County. We find no necessity to decide the merits of this issue. The Commission cannot complain that it is deprived of a neutral adjudication, given our de novo review of the record. *Cf. In Interest of Thompson*, 241 N.W.2d 2, 4 (Iowa 1976) (reversal not required where trial court considered juvenile's involuntary confession when review was de novo and sufficient evidence existed apart from confession to affirm adjudication of delinquency); *In Interest of Meek*, 236 N.W.2d 284, 290 (Iowa 1975) (rule that prejudice presumed where improper evidence admitted at trial is inapplicable in de novo review of delinquency adjudication); *In Interest of Wheeler*, 229 N.W.2d 241, 243 (Iowa 1975) (reversal not required where trial court applied erroneous standard of proof when review was de novo and proper standard could be applied on appeal). No additional evidence was taken in the district court; thus the record before us is identical to that on which the Commission based its decision. On de novo review we review "the facts as well as the law and adjudicate rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the course of the trial court's proceedings." *In Interest of Voeltz*, 271 N.W.2d 719, 722 (Iowa 1978); *City of Central City v. Knowlton*, 265 N.W.2d 749, 752 (Iowa 1978). The Commission is therefore not prejudiced by the district court's refusal to change the venue.

III. *Constructive discharge.* The Commission found that Berdell resigned her position to escape "intolerable and illegal em-

ployment requirements" and that the resignation thus constituted a constructive discharge. The district court did not address the propriety of that finding.

Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. Federal decisions are persuasive in the absence of contrary Iowa decisions. *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir. 1981); *Thompson v. McDonnell Douglas Corp.*, 552 F.2d 220, 223 (8th Cir. 1977); *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975). To find constructive discharge the fact finder must conclude that "working conditions would have been so difficult or unpleasant" that a reasonable person in the employee's position would be compelled to resign. *Bourgue v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir. 1980); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977).

Our de novo review of the record discloses the following facts. During its first year of operation in 1973, BHDCS was principally involved in the supervision of persons placed on probation by the district court of Black Hawk County. It also performed some pretrial services at the request of the court and became increasingly responsible for conducting presentence investigations. In October 1974 an amended funding grant permitted BHDCS to expand its staff and its scope of services. As a result of that expansion BHDCS became more involved in the area of pretrial services.

The concept of pretrial services consists of two phases. In the interview phase information is obtained from a newly arrested person to determine whether he is eligible for pretrial release and the terms and conditions of release. In a case where the court releases a person under supervision the counseling phase commences. In that phase a counselor provides the necessary supervision through a series of counseling sessions and also directs the person to the assistance of community service agencies for rehabilitative purposes.

To implement the expansion into the pretrial services area, BHDCS ran newspaper advertisements seeking applicants for the positions of interviewer and of counselor. The funding grant authorized BHDCS to hire among others one chief pretrial interviewer, two pretrial interviewers, and two pretrial counselors. Berdell was one of the numerous applicants for the pretrial counselor position. In her application letter she stated that her skills and knowledge of community services could best be utilized in the area of counseling. Her educational background in social work was also consistent with the counseling function.

Berdell was hired as a part-time pretrial counselor. The grant specified a full-time counseling position, but she was unable to devote full attention to BHDCS because of her concurrent position as a member of the Waterloo City Council. BHDCS was in need of a person with Berdell's counseling education and experience and therefore hired her despite her inability to serve BHDCS on a full-time basis.

BHDCS was modeled after the Polk County Department of Court Services which maintained a separation of the positions of interviewer and counselor. The rationale behind that separation of functions is traceable to the skill necessary to accomplish each of them. While the interviewing position is predominantly a data gathering procedure requiring mainly the ability to read and write, the counseling position demands a person educated in the field of social work. The theory is that the separation of functions avoids use of the time of a trained counselor in the interviewing function.

The grant authorizing BHDCS's expansion into the pretrial services area was consistent with that theory; it specified separate interviewer and counselor positions and contained a job description of each. Although that grant specified separate functions, Berdell was required to perform both interviewing and counseling duties. During her period of employment BHDCS was experimenting through the process of trial

and error to develop a standard policy for providing pretrial services and had yet to evolve specialization of functions. Such specialization was contemplated, however, and BHDCS was moving in this direction at the time of Berdell's resignation.

After a month of employment at BHDCS, Berdell made known to director Burbridge that she was dissatisfied with her responsibilities. Notes of a meeting between Berdell and Burbridge reveal that she complained about having to perform interviews, as she did not bargain for such duties when she accepted the position. She further complained that she did not bargain for the night work she was required to perform as an interviewer. That work involved her assignment on Friday evenings to interview newly arrested individuals. She indicated that her duties were too tenuous in nature and that she could not continue with BHDCS unless a change was made.

Berdell continued serving in both roles until early January 1975 when tension between the sheriff's personnel and BHDCS over her presence at the jail culminated in jeopardizing access to the jail for all BHDCS personnel. Burbridge then restricted her access to the jail on January 3, 1975, in an attempt to secure the admission of other BHDCS personnel into the jail. Berdell resigned on the following day as a result of his order.

Berdell claimed that her access to the jail was restricted because of her race and disability. She further claimed, and the Commission agreed, that she was compelled to submit her resignation to escape intolerable conditions of employment. Our de novo review of the record convinces us otherwise.

■ To constitute a constructive discharge Berdell has the burden of showing that a reasonable person in her position would have felt compelled to resign. Under the record, the restriction of her access to the jail affected only her duties as an interviewer. In no way did it curtail her ability to perform the counseling function. Burbridge testified that the restriction would in fact enhance her abilities as a counselor, as she would have additional time to devote to the supervising and counseling of her clients. The effect of Burbridge's order was consistent with the counseling position for which Berdell applied, consistent with her skills and educational background, and consistent with the complaints she had earlier voiced concerning her responsibility for conducting interviews. On this record we cannot say that Berdell's restriction to counseling duties created work conditions that were so difficult and unpleasant that a reasonable person in her position would be compelled to resign.

Our conclusion is supported by other cases in which the working conditions were similar to the present ones or even more burdensome than in this case, and yet no constructive discharge was found. *See Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 454 (10th Cir. 1981) (no constructive discharge where employer refused to promote black employee or to transfer him to other position within company); *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir. 1981) (no constructive discharge where black employee paid less than white employees); *Bourgue v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 66 (5th Cir. 1980) (no constructive discharge where female employee paid less than male employees for same job); *English v. Powell*, 592 F.2d 727, 733 n.4 (4th Cir. 1979) (no constructive discharge where employee resigned after being threatened with termination by employer); *Thompson v. McDonnell Douglas Corp.*, 552 F.2d 220, 223 (8th Cir. 1977) (no constructive discharge where black employee claimed unequal pay, discriminatory transfer, and refusal to promote created intolerable conditions); *Muller v. United States Steel Corp.*, 509 F.2d 923, 929 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) (no constructive discharge where employer failed to consider Spanish-American employee for promotion and assigned him to area which prevented any promotion and where court found such actions were not designed to coerce his termination); *Frazer v. KFC National Management Co.*, 491 F.Supp. 1099, 1105–06 (M.D.Ga.1980), *aff'd,*

636 F.2d 313 (5th Cir. 1981) (no constructive discharge where retirement-aged employee was removed from district manager position but offered area manager job with less responsibility but equal pay and benefits); *Flora v. Moore*, 461 F.Supp. 1104, 1117–18 (N.D.Miss.1978) (no constructive discharge of black female maids and cook where maids assigned allegedly intolerable duty of cleaning hospital delivery room and where cook was required to postpone three-week paid vacation, to which she was concededly entitled, because of shortage of employees).

■ Moreover, the record is barren of evidence to suggest that Burbridge desired to impose intolerable working conditions on Berdell. To the contrary, the record indicates that Berdell possessed more education and experience in the area of counseling than anyone else in BHDCS and that Burbridge believed her to be essential to the pretrial services area. Burbridge testified that he was "awe-struck" by the resignation as it left him without a person of her credentials and experience to provide meaningful pretrial release supervision. He also testified that he never anticipated that his restriction order would prompt such a response. The record also discloses that Berdell had tendered her resignation in late December 1974 over an unrelated incident, but that Burbridge had successfully persuaded her to remain at BHDCS.

■ In short, we find that Berdell failed to make a good faith effort to determine whether the restriction from the jail would render her employment as onerous as she now contends. *See Flora*, 461 F.Supp. at 1117. Further, the record contains nothing to indicate that Burbridge's order was permanent in nature. In fact, Burbridge testified that the order was an emergency arrangement and that he fully intended to discuss the problem with her when he returned from vacation. Her immediate resignation, however, deprived him of the opportunity to investigate and remedy the situation.

Berdell was precipitous; she overreacted. We hold on the record that Burbridge did not "constructively discharge" her.

IV. *Successor liability.* The Commission found that the Department evolved from BHDCS and was thus liable for the latter's discriminatory act under the theory of successor liability. The district court concluded, however, that Berdell did not prove the Department was a successor of BHDCS; hence the Department could not be held liable for back pay or reinstatement.

Again federal decisions are persuasive. The doctrine of successor liability developed in labor law cases involving the obligation of a successor employer to remedy unfair labor practices of his predecessor. The first application of the doctrine to an employment discrimination case came in *Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). The court held that the notion of successor liability was consistent with the broad remedial purpose of Title VII of the federal Civil Rights Act of 1964 to provide relief to victims of employment discrimination. *Id.* at 1091. The court also held, however, that the liability of a successor is not automatic but must be determined on a case-by-case basis. *Id.* The court then identified the following factors as relevant to the imposition of liability for the discriminatory acts of a predecessor employer:

1) [W]hether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

*Id.* at 1094. Since *MacMillan Bloedel*, other courts have applied these factors in determining the successor liability issue. *See Slack v. Havens*, 522 F.2d 1091, 1094–95 (9th Cir. 1975); *Brown v. Evening News*

*Association,* 473 F.Supp. 1242, 1244 (E.D. Mich.1979); *Escamilla v. Mosher Steel Co.,* 386 F.Supp. 101, 104 (S.D.Tex.1975). *See generally* 2 A. Larson and L. Larson, *Employment Discrimination* § 49.42, at 9B–77 (1981); B. Schlei and P. Grossman, *Employment Discrimination Law* 971 (1976); Barksdale, *Successor Liability Under the National Labor Relations Act and Title VII,* 54 Texas L.Rev. 707, 725–34 (1976). The Iowa Commission has adopted these factors and, in fact, applied them in reaching its decision here.

■ For purposes of analysis the factors can be separated into three requirements. *See Brown,* 473 F.Supp. at 1245. Imposition of successor liability is proper only when (1) the successor had notice of the existing charge of discrimination, (2) the predecessor is presently unable to provide relief, and (3) substantial continuity exists between the operations of the predecessor and successor. Factors four through nine are essentially concerned with continuity and are analyzed as components of that requirement. We turn to the record to determine whether three requirements were satisfied here.

■ A. As to the requirement of notice, the Commission contends that the Department had at least constructive notice of Berdell's discrimination complaint against BHDCS. It bases its argument upon evidence that David J. Dutton was counsel for both organizations, and upon evidence that James Kilman, the director of the Department, was in close contact with Keith Burbridge during the previous time while the latter was director of BHDCS.

Our review of the record fails to disclose any evidence that Mr. Dutton served as counsel to BHDCS. On the other hand, our review does disclose the following testimony regarding the Department director, who was formerly with the crime commission:

Q. Mr. Kilman, did you monitor the progress of Project Link-up and the [Black Hawk] Department of Court Services as part of your job? A. Yes, very closely.

Q. It is a fair statement that you have been intimately connected with community corrections in Waterloo and Black Hawk County since its inception in 1973? A. Yes.

Given Kilman's close association with BHDCS as director of the crime commission, and his present role as director of the Department, we conclude that the Department had notice of Berdell's employment discrimination complaint against BHDCS.

■ B. The second requirement is ability on the part of the predecessor to provide relief. The Commission found that BHDCS no longer existed and was therefore unable to provide Berdell with back pay or reinstatement. We agree with that finding.

■ C. The final requirement is continuity of operations. The Commission concluded that the Department evolved from and was the direct successor of BHDCS. The record discloses the following.

BHDCS originated in 1973 under a funding grant approved by the Northeast Iowa Crime Commission. It was not created pursuant to a legislative act. James Kilman, then of the crime commission, was instrumental in implementing the technical aspects of the program and in monitoring its progress. The fund grantees for BHDCS were the City of Waterloo via the chief of police and Black Hawk County via the county attorney. Soon after the inception of the program the administration and supervision of BHDCS was placed in the hands of the judges of Black Hawk County and it became solely responsible to them. Keith Burbridge was hired by the Black Hawk District Court as director of the program. Hence, BHDCS was locally funded and supervised. BHDCS ultimately expanded to include first, Grundy and Buchanan Counties, and later, six other counties in the First Judicial District. With reference to termination, the record discloses only that BHDCS ceased functioning sometime in 1975.

The record contains little evidence concerning the establishment and operation of the Department. The only evidence in that regard came from the testimony of James

Kilman, the Department's director. He testified that the Department was created pursuant to a legislative act, that it encompasses all the counties in the First Judicial District, and that it is governed by a board of directors whose membership is statutorily prescribed. He further testified that the Department is regulated on the state level by the Department of Social Services, Division of Corrections, and that it is funded through the Department of Social Services budget process. He also stated that while BHDCS was a creation of the judicial branch of government, the Department is an agency of the executive branch. Finally, he noted that the Department does employ persons for the purpose of performing pretrial release interviews in Black Hawk County.

When compared with the factors relevant to continuity of operations, the record does not establish a connection between BHDCS and the Department. Although these factors were developed in the decision to determine whether substantial continuity existed after the purchase of a business, they are adaptable to the present situation.

Here we find no evidence as to whether the Department operates in the same offices as did BHDCS. *See McLendon v. M. David Lowe Personnel Services*, 15 F.E.P. 250 (S.D.Tex.1977) (court found successor liability relying in part on evidence of same offices); *Escamilla v. Mosher Steel Co.*, 386 F.Supp. 101 (S.D.Tex.1975) (court refused to grant successor's motion to dismiss relying in part on finding of same plant). Likewise, the record fails to disclose whether the Department has employed the same persons that were formerly employed by BHDCS. *See E.E.O.C. v. Sage Realty Corp.*, 24 F.E.P. 1521 (S.D.N.Y.1981) (court found successor liability relying in part on evidence that successor retained 90% of predecessor's employees); *E.E.O.C. v. Oakley-Keesee Ford, Inc.*, 13 F.E.P. 850 (W.D. Tenn.1976) (successor liability where 75% of employees retained). On the contrary, the evidence indicates that employment of a majority of the BHDCS staff was terminated by director Keith Burbridge before the Department was ever established. *See*

*Forde v. Kee Lox Manufacturing Co., Inc.*, 584 F.2d 4 (2nd Cir. 1978) (no successor liability where none of predecessor's employees retained); *Burt v. Ramada Inn of Oxford, Mississippi*, 507 F.Supp. 336 (N.D. Miss.1980), *aff'd*, 650 F.2d 281 (5th Cir. 1981) (no successor liability where no notice and one of thirty-one employees retained).

The record is silent as to whether the Department has retained the supervisory personnel formerly associated with BHDCS. *See Oakley-Keesee Ford*, 13 F.E.P. 850 (successor liability found where successor retained four of five supervisors). The record does show that the Department, like BHDCS, conducts pretrial release interviews in the Black Hawk County jail, but it fails to indicate whether other services performed by BHDCS, such as pretrial release counseling and presentencing investigations, are currently performed by the Department and whether the Department may be providing services not performed by BHDCS. *See Forde*, 584 F.2d 4 (court found no successor liability relying in part on evidence that successor manufactured only four of predecessor's twelve products); *Sage*, 24 F.E.P. 1521 (successor liability where court relied in part on evidence that successor performed same services as predecessor). Likewise, we find no evidence as to whether the Department uses the methods and adheres to the theories concerning pretrial release employed by BHDCS. *See Forde*, 585 F.2d 4 (court found no successor liability relying in part on finding that successor employed different methods of production). Moreover, the record is unclear whether BHDCS ever provided pretrial release services to persons in other counties of the First Judicial District. Finally, the record is silent with respect to whether a transfer of assets and liabilities took place from BHDCS to the Department. *See Sage*, 24 F.E.P. 1521 (successor liability where all assets and liabilities transferred); *Oakley-Keesee Ford*, 13 F.E.P. 850 (same); *Escamilla*, 386 F.Supp. 101 (motion to dismiss denied where court relied in part on evidence that all assets were transferred).

Our de novo review of the record convinces us that under the *MacMillan Bloedel* factors the evidence does not establish the necessary continuity between BHDCS and the Department. We therefore hold that the doctrine of successor liability is inapplicable in the present case.

The rationale relied on by other courts in justifying the imposition of liability on an innocent employer for the discriminatory acts of another employer gives us added confidence in our denial of successor liability here. The United States Supreme Court discussed the equities of imposing liability upon a successor for the unfair labor practices of a predecessor in *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 171–72 n.2, 94 S.Ct. 414, 418–19 n.2, 38 L.Ed.2d 388, 395 n.2 (1973), and quoted with approval from *Perma Vinyl Corp.*, 164 N.L.R.B. 968, 969 (1967), *enforced sub nom. United States Pipe-Foundry Co. v. N.L.R.B.*, 398 F.2d 544 (5th Cir. 1968):

> "In imposing this responsibility upon a bona fide purchaser, we are not unmindful of the fact that he was not a party to the unfair labor practices and continues to operate the business without any connection with his predecessor.... The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship upon him. *When he substituted himself in place of the perpetrator of the unfair labor practices, he became the beneficiary of the unremedied unfair labor practices. Also, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.*"

(Emphasis added.) The court in *MacMillan Bloedel* relied in part on this quoted statement to justify the application of successor liability to employment discrimination cases under Title VII. 503 F.2d at 1090. The *MacMillan Bloedel* court further stated that "[i]t is to be emphasized that the equities of the matter favor successor liability because it is the successor who has benefited from

the discriminatory employment practices of its predecessor." *Id.* at 1092.

The present case contains no evidence to suggest that the Department in any manner benefited from the resignation of Berdell. Quite to the contrary, the Department would have profited from having Berdell on its staff, given her extensive background in social work. Finally, the record fails to disclose any agreement between BHDCS and the Department whereby the Department would be indemnified by BHDCS in the event Berdell prevailed on her discrimination complaint.

We conclude that Berdell was not the victim of a constructive discharge and that the Department cannot be held for the act of BHDCS under the successor liability doctrine.

AFFIRMED.