**Raymond ZBYLUT, Plaintiff,**

v.

**HARVEY'S IOWA MANAGEMENT COMPANY INC. and/or Harvey's Casino, Defendant.**

No. CIV.1–00–CV–10076.

United States District Court,
S.D. Iowa,
Western Division.

Feb. 28, 2003.

Bruce B. Green, Willson & Pechacek PCL, Council Bluffs, IA, Dennis M. O'Bryan, Kirk E. Karamanian, O'Bryan Baun Cohen & Kuebler, Birmingham, MI, for Plaintiff.

Donald J. Pavelka, Jr., Thomas M. Braddy, Locher Cellilli Pavelka & Dostal LLC, Omaha, NE, for Defendants.

## ORDER

LONGSTAFF, Chief Judge.

THE COURT HAS BEFORE IT defendant's motion for summary judgment, filed December 2, 2002. Plaintiff resisted the motion December 24, 2002 defendant filed a reply on January 2, 2003. The motion is fully submitted.[1]

### I. BACKGROUND

The following relevant facts either are not in dispute or are viewed in a light most favorable to plaintiff. On October 8, 1999, plaintiff Raymond Zbylut began working for defendant Harvey's Iowa Management Company, Inc., and/or Harvey's Casino ("Harvey's") in Council Bluffs, Iowa as a licensed assistant engineer aboard Harvey's casino vessel, the M/V Kanesville Queen. Plaintiff remained an at-will employee throughout his tenure with Harvey's.

The Kanesville Queen is governed by a Coast Guard Certificate of Inspection. To ensure the safety of the vessel, passengers, crew and cargo, if any, this Certificate calls for, among other things, the engineering department to be manned by one chief engineer and two engine technicians at all times. The terms "engine technician" and "engine utilityman" are interchangeable.

As an assistant engineer, plaintiff supervised engine utilitymen. His position in turn was subordinate to the chief engineer.

Engine utilitymen are responsible for basic watch keeping, engineering support and emergency equipment operations.

---

1. Defendant filed a supplemental appendix on January 2, 2003. In addition, the Court notes defendant has requested oral argument on its motion. After reviewing the pleadings and applicable law, however, the Court finds oral argument unnecessary.

Additional responsibilities include completion of routine maintenance, pumping sewage from the vessel and refilling the vessel's potable water tanks.

As an assistant engineer, plaintiff was responsible for filling out the vessel's engine room logs under the direction of the chief engineer. The engine room logs are signed by the chief engineer and the assistant engineer.

Plaintiff states that during the entire time he worked for Harvey's, he was personally ordered to falsify the engine room log books to make it appear that Harvey's was complying with the Coast Guard requirement that the engine room be staffed at all times with two engine technicians-when in fact Harvey's was not meeting this requirement. Typically, plaintiff would report for work in the engine room and immediately be told by the chief engineer to call up the mate in the pilothouse and get from him a name to be recorded in the engine room log book as having worked that particular shift in the capacity of engine utilityman. Plaintiff was also unaware of any of the individuals participating in drills as engine utilitymen in accordance with the duties outlined for that position in the vessel's station billet.

Plaintiff first began to complain about falsifying the engine room logbooks approximately four months after he began working for Harvey's. He was told by his superior officer, Chief Engineer Dan Dugan, to "just do it." When plaintiff brought the issue to the attention of the other chief engineer he was told to "just follow orders and keep your mouth shut."

Thereafter, plaintiff states he was ostracized by his superior officers in the engineering department and subjected to "constant harassment." During one incident, after plaintiff pointed out to Chief Engineer Dugan plaintiff's belief that applicable regulations and safety procedures called for the use of a bonding cable when refuel-ing the vessel, Dugan began shouting at plaintiff and told him "that wasn't the way they did things at Harvey's."

Plaintiff brought this incident and other alleged safety violations to the attention of the chief engineers and the vessel captains and was told to "keep his mouth shut." He also informed Chief Engineer Richard Penney, in the presence of Captain Tom Gartner, of Dugan's treatment of him after plaintiff complained to him about the log book practices.

On one occasion in January 1998, Chief Engineer Dugan referred to Filipino women as whores and prostitutes in plaintiff's presence, knowing that plaintiff's wife was Filipino and that he and his wife had an infant daughter. Dugan went into graphic detail describing Filipino women engaging in various sex acts, and looked directly at plaintiff even though Dugan was speaking with another person. Dugan also repeatedly referred to Filipino women as "LBFMs" an acronym for "Little Brown Fucking Machines." Plaintiff later admitted in a letter plaintiff wrote to Chief Engineer Penny and the human resources department that Chief Engineer Dugan later apologized, "saying he was out of line, and that he didn't intend to mean it as I interpreted it to be. The matter was dropped, and never mentioned again." Exh. 2 to Dep. of Raymond Zbylut, Defendant's App. at 31–32.

Plaintiff asked Chief Engineer Dugan to stop making these comments on several occasions, and reported Dugan's comments to Chief Engineer Penny and Captain Gartner. Chief Engineer Penny told plaintiff it was his word against Dugan's.

On December 14, 1998, plaintiff requested a "Board of Review" from Harvey's to discuss the following issues: 1) a wage adjustment; 2) a "change in procedure or policy;" 3) "corrective action when it is determined that a company policy or pro-

cedure is not being followed;" and 4) an "investigation of any alleged practice which may be detrimental to the company, or employee's interest." Exh. 2 to Deposition of Raymond Zbylut, included in Defendant's App.

Rather than forward plaintiff's written request to human resources, a few days later Penny called plaintiff at home and asked him to come to a meeting at the ship's pilot house. Several captains and chief engineers also were in attendance. Plaintiff states that during the meeting, the captains and/or chief engineers made it clear they did not want plaintiff's complaints reported to Harvey's upper management. Plaintiff states he felt forced to acquiesce due to his need to support his family.

Also on December 14, 1998, plaintiff sent a separate letter to Chief Engineers Penny, Dugan, Crane and Pauly requesting a salary increase. The requested pay raise was denied in February 1999 as not "commensurable for the position."

Plaintiff later went directly to human resources to complain about Chief Engineer Dugan and the log book practices. Plaintiff told human resources personnel he believed other individuals in the engine room were alienating him because of his expressed concerns about engine room practices.

On or about July 30, 1999, plaintiff was again verbally attacked by Chief Engineer Dugan after plaintiff ordered a pizza from the ship's galley while at work. When plaintiff suggested to Dugan that he would take some of the uneaten pizza home to his wife, Dugan replied: "You're not taking any fucking pizza home to your fucking wife." Plaintiff states that as of this date, Dugan's mistreatment of him was "constant."

Following the pizza incident, plaintiff prepared a written complaint regarding Chief Engineer Dugan's conduct toward him, which he gave to Chief Engineer Penny with instructions that it be forwarded to human resources.

In September 1999, plaintiff resigned from his employment with Harvey's. Plaintiff contends the working environment was so unbearable that he was forced to leave.

Plaintiff filed the present complaint on December 26, 2000, alleging that he was wrongfully terminated for refusing to violate a federal safety statute, 46 U.S.C. § 8101. Plaintiff also alleges he was constructively discharged due to his resistance to defendant's allegedly illegal practices.

In its present motion for summary judgment, defendant argues that general admiralty and maritime law does not provide a private cause of action for wrongful discharge, and that in any event, plaintiff's allegations of fact do not amount to a constructive discharge.

## II. APPLICABLE LAW AND DISCUSSION

### A. Summary Judgment Standard

A court shall grant a motion for summary judgment only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must consider the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Kindred v. Northome/Indus. School Dist. No. 363*, 154 F.3d 801, 803 (8th Cir.1998), *cert. denied*, 525 U.S. 1109, 119 S.Ct. 881, 142 L.Ed.2d 781 (1999).

To preclude the entry of summary judgment, the nonmovant must make a show-

ing sufficient to establish the existence of every element essential to his case, and on which he has the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Reed v. ULS Corp.,* 178 F.3d 988, 989 (8th Cir.1999). When a motion is made and supported as required in Federal Rule of Civil Procedure 56(a), the adverse party may not rest upon the mere allegations or denial in his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. At the summary judgment stage, the court may not make determinations about the credibility of witnesses or the weight of the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where inconsistent inferences can reasonably be drawn from undisputed evidentiary facts, it is for a jury rather than the courts to decide which reasonable inference to draw. *Ryther v. KARE* 11, 108 F.3d 832, 845 (8th Cir.) (en banc), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

B. Whether Admiralty and Maritime Law Recognize Employment-at-will Exception

■■■■ Plaintiff alleges in the present case he was constructively discharged under federal admiralty and maritime law in retaliation of his refusal to violate a federal safety statute.[2] As acknowledged by both parties, courts applying federal maritime law generally recognize exceptions to the employment at-will doctrine when the employee is discharged for "1) refusal to commit an unlawful act, 2) performance of an important public obligation, or 3) exercise of a statutory right or privilege." *Feemster v. BJ–Titan Services,* 873 F.2d 91, 93 (5th Cir.1989) (internal citations omitted); *see also Smith v. Atlas Off–Shore Boat*

*Service, Inc.,* 653 F.2d 1057, 1063 (5th Cir.1981) (recognizing public policy exception to employment at-will doctrine when discharge resulted from employee filing a personal injury claim under the Jones Act). The two federal Circuit Courts of Appeal to address the issue, however, have expressly *declined* to extend the list of exceptions to include the refusal to violate a federal safety regulation. *See Meaige v. Hartley Marine Corp.,* 925 F.2d 700 (4th Cir.1991) (finding no private right of action under general maritime law for retaliatory discharge due to seaman's refusal to carry out assignment that allegedly would violate federal safety statute, *and* that federal law pre-empted state common law in the area); *Garrie v. James L. Gray, Inc.,* 912 F.2d 808 (5th Cir.1990) (no general maritime cause of action prohibiting discharge of seaman who report or threaten to report safety violations); *Feemster,* 873 F.2d at 93 (no federal maritime cause of action for tugboat captain discharged after repeatedly refusing to make non-stop, eighteen hour barge run, contending such a trip violated statute restricting operation of vessel to twelve hours in a twenty-four hour period). As explained by the Fifth Circuit in *Feemstra:*

After thorough consideration of the facts and circumstances of the case, we have concluded that an exception to the employment-at-will doctrine is not warranted and that *Smith* should not be broadened to apply here. In the first place, public policy considerations are not so clearly implicated in this case as they were in *Smith.* In *Smith,* the plaintiff had a statutory right to bring a personal injury action against his employer. His discharge was a clear case of retaliation for exercising a statutory right since the employer punished Smith

---

2. For purposes of this discussion, the Court need not determine whether plaintiff's alleged conduct in falsifying the log book in fact violated federal statutory or regulatory law.

for doing what the law explicitly permitted him to do. In this case, as Feemster concedes, the statute at issue provides him with no *personal* right to refuse a management directive with which he disagreed, even if it violated a safety statute.

Second, we think it is inappropriate for us to engraft on this congressional act an additional provision granting a *private cause of action.* To do so would create new rights and duties when Congress, in enacting the statutes on which Feemster relies, clearly chose not to do so.

*Feemster,* 873 F.2d at 93 (emphasis added). The *Feemster* court then noted that its "denial of a legal cause of action to a seaman here does not deny an individual seaman a voice in the enforcement scheme and the right to claim the benefits of the statute. An employee can complain of safety violations to the Coast Guard and enlist its aid to prevent such violations." *Id.* at 93–94.

Plaintiff attempts to distinguish *Feemster* by arguing that the safety statute at issue in *Feemster,* 46 U.S.C. § 8104 "concerns only overtime labor," and recognizes circumstances under which a captain may require operators to work more than twelve hours in a consecutive twenty-four hour period. According to plaintiff, the engine room manning requirement at issue in the present case is far more important to the safety of the passengers and crew. *See* 46 U.S.C. § 8101(d) ("A vessel to which this section applies may not be operated without having in its service the complement required in the Certificate of Inspection.").

As a practical matter, this Court is not convinced that prohibiting seaman from operating a vessel more than twelve hours during a consecutive twenty-four hour period is any less important to the safety of passengers, crew and oncoming vessels

than the number of engine technicians in an engine room. Plaintiff's attempt to categorize the statute at issue in *Feemster* as a simple overtime statute is unpersuasive. Even if this were true, however, recognizing a federal cause of action in this instance would exceed the scope of the judiciary's power. *See Feemster,* 873 F.2d at 93 (noting it was not court's role to create "new rights and duties" when Congress expressly chose not to do so). This Court does not believe the Eighth Circuit would take such action in the present case. Summary judgment is granted on plaintiffs' wrongful discharge claim under federal maritime and/or admiralty law.

**C. Whether Plaintiff Has Sufficiently Alleged Constructive Discharge under Iowa Law**

In his resistance to defendant's motion for summary judgment, plaintiff contends that even if he cannot survive summary judgment under federal law, he has an alternative claim for wrongful discharge under Iowa common law. *See Clements v. Gamblers Supply Management Co.,* 610 N.W.2d 847 (Iowa 2000) (finding federal maritime law did not pre-empt state law wrongful discharge claim for wrongful discharge in retaliation for refusing to comply with management's alleged request to violate safety regulations). Again, this Court does not agree.

**1. Whether Plaintiff has Pled State Claim**

Paragraph 2 of plaintiff's "Complaint in Admiralty" provides as follows: "Subject matter jurisdiction is governed by the general maritime law, which in and of itself, and *in borrowing from the laws of the State of Iowa, both prohibit terminations based on refusal to violate federal law* (here 46 USCA 8101), the former requiring a risk of serious injury or death to

passengers and crew." Complaint at ¶ 2 (emphasis added). Plaintiff has not alleged separate counts or causes of action under state and federal law, and a defendant could easily construe plaintiff's complaint as alleging a single cause of action under federal admiralty and/or general maritime law.

Nevertheless, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED R. CIV. P. 8(a)(2). The intent of "notice pleading" is to ensure simply that the defendant has "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although plaintiff's complaint is far from a model of clarity, because he has alleged that "both" state and federal law prohibit discharge from employment "for refusing to violate federal law," the Court concludes plaintiff has sufficiently alluded to state law to provide defendant with "fair notice" of a potential state law claim. *Id.*

### 2. Whether Facts Alleged Support Constructive Discharge

 Assuming, however, that plaintiff has adequately *pled* a cause of action for wrongful discharge under Iowa law, to survive summary judgment he must nevertheless allege facts sufficient to create a material issue of fact as to whether he was constructively discharged. Under Iowa law, an employee is considered to have been constructively discharged " 'when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000) (quoting *First Judicial Dist. Dep't of Correctional Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982)). In order to succeed on a claim of constructive dis-

charge, plaintiff must establish his working environment was "so difficult or unpleasant that a reasonable person in the employee's position would be compelled to resign." *Id.* (quoting *First Judicial Dist.*, 315 N.W.2d at 87) (additional internal citation omitted).

This Court has not located a reported decision of the Iowa Supreme Court in which a plaintiff has been successful in establishing a constructive discharge claim. *See Balmer*, 604 N.W.2d at 642 (rejecting constructive discharge as a stand-alone tort); *Sievers v. Iowa Mutual Ins. Co.*, 581 N.W.2d 633, 639 (Iowa 1998) (upholding defense verdict on plaintiff's claim she had been constructively discharged based on age); *Haberer v. Woodbury Cty.*, 560 N.W.2d 571, 576 (Iowa 1997) (fact deputy sheriff was subjected to criminal investigation and forced to defend himself did not establish constructive discharge); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985) (bank employee's reassignment to another office after his relationship with other bank employees deteriorated did not constitute constructive discharge); *First Judicial Dist.*, 315 N.W.2d at 85 (no constructive discharge after supervisor restricted access of pretrial counselor to jail after received "continuous series of complaints" that counselor refused to follow jail rules).

Constructive discharge claims also have been addressed in the Iowa Court of Appeals. *See Ayers v. Food & Drink, Inc.*, Nos. 0–023, 99–283, 2000 WL 1298731 (Iowa App. Aug. 30 2000); *Goethals v. Mueller*, 1999 WL 1020545, Nos.1999–190, 9–414, 98–1556 (Iowa App. Nov. 10, 1999). In *Goethals*, the plaintiff, who was pregnant at the time, alleged she was constructively discharged due to a sexually hostile work environment after only nine days of employment. She based her claim on the following incidents:

1) [her supervisor's] statement to her during the job interview that he was a male chauvinist and he expected his employees to work under his terms; 2) a policy requiring his staff to look like they were going on a date; 3) [her supervisor's] placement of his arms around her when he was introducing her to a colleague; and 4) a conversation he had with [plaintiff] about her wish not to be touched or harassed.

*Goethals*, 1999 WL 1020545 at *5. In affirming the district court's dismissal, the Iowa Court of Appeals found the single incident of unwanted touching insufficient to establish plaintiff's claim. *Id.*

In *Ayers*, a pregnant restaurant worker alleged sexual harassment and constructive discharge after a five-month series of events culminated in the restaurant's principal owner, James Lynch, commenting that plaintiff's "boobs" were getting "huge;" rubbing her abdomen in such a way that he would leave his hand on her breasts, and trapping her in a corner, rubbed his groin against her, and asked her if she planned to name the baby "Little Jimmy." *Ayers*, 2000 WL 1298731, at *1. The plaintiff hid in the restroom when Lynch entered the restaurant four days later, and submitted her resignation within two days thereafter. *Id.*

A jury returned a verdict in favor of plaintiff on her claims of sexual harassment and battery. *Id.* at *2. The Iowa Court of Appeals subsequently affirmed the verdict on all but the award of back pay on the plaintiff's battery claim. *Id.* at *9. In reaching its holding, the court expressly found that, under the facts alleged, "the plaintiff's quitting was a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* at *4.

Chief Engineer Dugan and others' conduct in the present case does not rise nearly to the level of that alleged in *Ayers*, however. Viewing the facts in the light most favorable to plaintiff, the Court finds Chief Dugan's and other engine room employees' conduct in yelling at plaintiff and ostracizing him for calling alleged log book infractions and other safety violations to their attention did not render plaintiff's work environment "so difficult or unpleasant that a reasonable person in the employee's position would be compelled to resign." *Balmer*, 604 N.W.2d at 641. Furthermore, although the single incident during which Dugan made derogatory remarks about Filipino women admittedly was highly offensive and inappropriate, Dugan not only apologized directly to plaintiff for his remarks, but refrained from repeating them in the future. Exh. 2 to Dep. of Raymond Zbylut, Defendant's App. at 31–32. *See, e.g., Goethals*, 1999 WL 1020545 at *5. (single incident of inappropriate conduct did not create hostile work environment or constructive discharge).

Most convincing to the Court, however, is the fact plaintiff was able to continue working for nearly eight months after Dugan made his derogatory comments about Filipino women, and for several weeks after the pizza incident. *But see Ayers*, 2000 WL 1298731, at *1 (plaintiff resigned employment within six days of most significant incidents of harassment). The Court therefore finds plaintiff has failed to establish a material issue of fact as to whether the conduct to which he was subjected during his employment on the M/V Kanesville Queen amounted to constructive discharge under Iowa common law.

## III. CONCLUSION

For the reasons outlined above, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment in favor of defendant Harvey's Iowa Management Company, Inc.

and/or Harvey's Casino and against plaintiff Raymond Zbylut.

IT IS SO ORDERED.