**VAN METER INDUSTRIAL,**
Appellant,

v.

**MASON CITY HUMAN RIGHTS
COMMISSION and Jane
Sires, Appellees.**

No. 02–1161.

Supreme Court of Iowa.

Feb. 25, 2004.

Mark L. Zaiger and Jennifer E. Rinden of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellant.

David A. O'Brien of Willey, O'Brien, Mullin, Laverty & Hanrahan, L.C., Cedar Rapids, for appellee Sires.

TERNUS, Justice.

The Mason City Human Rights Commission ruled that appellant, Van Meter Industrial (VMI), had discriminated against the appellee, Jane Sires, on the basis of her gender and had constructively discharged Sires from her job with VMI in violation of Iowa Code section 216.6 (1997). The Commission awarded back pay, front pay, and damages for emotional distress, denied punitive damages, and entered a remedial order requiring the company to develop job descriptions and policies to govern promotion decisions. On judicial review, the district court reversed the finding of constructive discharge but otherwise affirmed the Commission, including the damage awards. The court of appeals affirmed the district court with the exception of increasing the amount of front pay and back pay recoverable by Sires. We granted further review.

Upon our review of the record and the applicable legal principles, we hold there was substantial evidence to support the Commission's finding that Sires was constructively discharged from her employment at VMI. While we agree with the court of appeals that the Commission erred in calculating front pay and back pay, we conclude the amounts computed by the court of appeals must be increased due to our affirmance of the Commission's finding of constructive discharge. Finally, we concur in the district court's ruling that the Commission did not have authority to award punitive damages. In view of these conclusions, we vacate the decision of the court of appeals, affirm in part and reverse in part the judgment of the district court, and remand the case with directions.

*I. Scope of Review.*

Review of this agency decision is governed by the Iowa Administrative Procedure Act, Iowa Code chapter 17A.[1] *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n,* 672 N.W.2d 733, 740 (Iowa 2003). The errors asserted by the parties rest on two well-known grounds for reversal under section 17A.19(8): (1) the agency's factual findings are not supported by substantial evidence in the record as a whole; and (2) the agency relied on incorrect legal principles in making its decision. *See* Iowa Code § 17A.19(8)(*e*), (*f*).

In considering the claimed errors, we rely on well-established principles governing our review. "Evidence is substantial if a reasonable person would find it adequate to reach a given conclusion." *Civil Serv. Comm'n v. Iowa Civil Rights Comm'n,* 522 N.W.2d 82, 85 (Iowa 1994). That one may draw a contrary inference from the evidence does not mean the evidence in support of the agency's factual findings is insubstantial. *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 515–16 (Iowa 1990). If we conclude the agency has committed a legal error, it is our obligation to correct it. *See Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991). We turn now to a review of the evidence.

*II. Evidence in the Record.*

VMI is a wholesale distributor of electrical products, primarily in the industrial market. It has fifteen locations in Iowa, employs over 250 individuals, and has annual sales of approximately $100,000,000.

Jane Sires began her employment with VMI in 1988 as a part-time receptionist in the company's Waterloo location. She testified she soon realized there were two tracks for advancement within the company: the male track and the female track. Men, depending on their educational background and experience, generally started in the warehouse, moved up through counter sales, inside sales, and outside sales, with the possibility of eventually obtaining a branch manager position or more.[2] Women, on the other hand, started with clerical work and could advance to an "operations manager" or other support position, such as human resources or marketing. It was undisputed the ultimate key to advancement in the company was in sales. At the time Sires made her claim of discrimination, there were only one or two women in outside sales and they were both "lighting specialists," a narrow and less technical area of sales.

In 1991, Sires took a position as office coordinator at a newly opened branch in Mason City. This position did not involve sales. Because Sires realized she would need sales experience to advance in the company, she asked the branch manager, John Skow, to involve her in counter sales and inside sales. She told Skow her goal was to run her own branch. Skow accommodated Sires' request and noted in an evaluation of Sires' job performance that he would be hiring another individual to take over Sires' clerical duties so Sires could "transition into counter and inside

---

1. Because Sires' charge of discrimination was filed on May 21, 1998, the 1998 amendments to chapter 17A do not apply. *See* 1998 Iowa Acts ch. 1202, § 46 (making 1998 amendments to chapter 17A applicable to all agency proceedings commenced after July 1, 1999); *Midwest Auto. III, LLC v. Iowa Dep't of Transp.,* 646 N.W.2d 417, 421 (Iowa 2002).

2. A counter salesperson takes walk-in orders. An inside salesperson takes phone orders and theoretically has more technical knowledge in order to identify over the phone what products the customer needs or wants. An outside salesperson goes to the customer to sell company products, and focuses more on developing new customers.

sales." In her effort to advance in the sales arena, Sires completed the technical training available to inside salespersons and attended sales seminars offered by VMI.

In 1995 Pat Freilinger became the new branch manager in Mason City and promoted Sires to operations manager. Although Sires' duties were focused on overseeing all aspects of the daily operation of the branch, she continued to spend approximately forty percent of her time on inside sales. During this period, and throughout her employment with VMI, Sires received very favorable employee reviews.

In 1996 the company decided to restructure its branch organization. Freilinger was a key participant in the strategic planning process and was gone from the Mason City office for significant periods of time. Sires took on much of Freilinger's responsibilities during his absence, including business decision making. Her evaluations reflected that she performed these added duties with competence. Her reviews in 1996 and 1997 included the following assessments by Freilinger: (1) Jane has "taken on a lot of responsibilities and duties from me."; (2) Jane "understands the big picture of running a branch."; (3) Jane "does very well at making business decisions when I am out of the office."; (4) "Jane has done a great job at keeping the branch on track and holding things together."; and (5) "Jane has taken on more responsibility in the branch and done well with it. She really is the glue that holds things together on a day to day basis."

Under the new organizational structure, the position of branch manager was to be eliminated and a new position, "local leader," was created for each branch. The person in this role would be "a lead sales person with the sales knowledge and experience necessary to serve as the local 'figurehead' for clients." In addition, operations management was to be moved from the branch level to the regional level. As part of the reorganization, Freilinger was immediately moved to a new position, leaving vacant the Mason City branch manager position and the future local leader position.

At a January 1998 presentation on the new company organization held in Mason City, the regional general manager, Mark Schon, announced that anyone interested in the local leader job should speak to him. Sires was not present when this announcement was made because she had attended the same presentation earlier in Des Moines. In any event, no one, including Sires, contacted Schon about the local leader position. Schon did not post or advertise the position because he already had someone in mind for the job: Bill Meyers, an outside salesperson in the Mason City branch. Freilinger had hired Meyers, an electrician, in early 1997 with the idea that Myers would be the type of person who could take over for Freilinger should the opportunity arise for Freilinger to move up in the company.

When Schon was in Mason City for the reorganization presentation, he spoke with Sires about her responsibilities during Freilinger's transition to his new position. He informed Sires her salary and commission would stay the same, but she would have the potential to earn another $3000 based on new sales goals. Schon told Sires she "would be the go-to person for any sales decisions and business decisions and operations" when Meyers was out of the office, which was most of the time.

Sires was confident she would be promoted to branch manager upon Freilinger's departure and eventually local leader. Her confidence was buoyed by a memo prepared by an executive vice president of the company stating "the industry considers inside sales support as more important

than outside sales." Sires' experience was in inside sales, whereas Meyers had no experience in inside sales, only in outside sales, and that experience was in a non-supervisory capacity.

Schon returned to Mason City on February 6, 1998, and announced that Meyers, who had one year of company experience in outside sales, was the new local leader. Sires was devastated. Her administrative assistant asked Sires if she thought it was because she was a woman. Sires was so upset and tearful over the weekend that her husband became concerned she might need medical attention.

Nonetheless, Sires returned to work on Monday, February 9, and talked with Freilinger about her confusion and distress at not getting the local leader position. Freilinger said she was not considered for this job because she did not have enough sales experience. Sires pointed out, however, that men with less sales experience than she had had been promoted to branch manager.

The next day Sires spoke with Mary Beth Standerski, the director of human resources for VMI. She again expressed her disappointment and confusion and wondered whether there was any place left for her in the company. Standerski advised Sires to contact Schon, who had made the decision to put Meyers in the local leader position. Standerski also asked Sires if she thought the decision had been based upon sex.

Sires called Schon immediately. She asked what qualifications were considered for the position and what Meyer's qualifications were. Schon told Sires that he did not take qualifications into account. He said he viewed Meyers as a person who could be "molded" into the position, and that he was counting on Sires to help do that. Schon also observed that Sires' experience was in operations, not sales, and

he saw opportunities for Sires in the operations part of the company. Sires was not very comforted by Schon's vague reassurance and concluded that she had hit a "glass ceiling" with VMI.

On February 23, Sires told Freilinger that she "had reached [the] highest level [she] was going to be allowed to go" and that she was considering resigning. Freilinger asked her to wait and said that he would talk to Schon. Standerski called Sires a few days later and told her to "hang in there. It will work out."

A week passed with no response from anyone and Sires concluded they were ignoring her. On March 3, she told Standerski that she was going to resign. Standerski told her to wait. At Standerski's request, Schon then contacted Sires. Schon and Sires' conversation was much the same as their telephone conversation a week earlier. During their second conversation, however, Schon told Sires that if he had it to do over again, he would still promote Meyers over her.

Concluding she had been left with no reasonable alternatives, Sires resigned two days later on March 5, 1998. VMI accepted her resignation without protest. Although Sires obtained employment after her resignation, she was unable to find a job with comparable pay.

On May 21, 1998, Sires filed a claim of sex discrimination with the Mason City Human Rights Commission. After a contested case hearing, an administrative law judge issued a proposed decision that included the above factual findings. In addition, the ALJ noted that in February and March 1998, thirteen local leader positions were filled. All the local leaders were men: four had inside sales experience; six had outside sales experience; and three had sales management experience. Of eleven promotions between December 1997

and May 1998 when Sires filed her complaint, only four were female and none of the female employees were assigned to a local or regional leader position. The company explained the lack of women in leadership roles resulted from a scarcity of women in electrical wholesales with sales or technical backgrounds.

The ALJ rejected VMI's contention that Sires was not qualified for the local leader position. The ALJ concluded Sires could have handled not only that job but also the operations manager position during the organizational transition had she "been given the same kind of support [that] VMI gave to male employees in similar situations." Freilinger's claim that the company wanted someone who already had a sales job and could be the "go to guy" also lacked credibility in view of the evidence that other employees viewed Sires as the "go to" person. Moreover, Freilinger was well aware of the responsibilities Sires had capably taken on in his absence.

The ALJ also rejected other reasons offered by VMI for why Sires did not get the promotion: Sires did not apply for the position and she did not tell anyone she was interested in it. Although Sires did not apply for the job, neither did Meyers. Clearly, the ALJ stated, it would be discriminatory to require an application from females desiring the position, but not from male applicants. The ALJ found Freilinger's testimony that VMI was unaware Sires was interested in promotion within the company not credible. The ALJ concluded, therefore, that Sires was not considered for a leadership position because she was not a man.

The ALJ also found that Sires had been constructively discharged. The ALJ held that VMI management knew or should have known that Sires found her situation intolerable, yet they failed to take any action to clarify her role during the transition or to consider her for a leadership position in the Mason City branch or some other branch. The ALJ found that the only tenable option for Sires was to resign.

In awarding front pay and back pay, the ALJ found that in 1997 Meyers earned $50,000 in outside sales and Sires earned $29,140 as operations manager. When Meyers was moved into the local leader position, he received a $2000 raise. The ALJ concluded, therefore, that had Sires been designated as the local leader, she too would have received $2000 more per year. Consequently, in determining Sires' damages, the ALJ assumed Sires would have earned $31,140 had she been promoted. Basing her computation on the difference between this figure and Sires' actual earnings at VMI and subsequent jobs, the ALJ determined Sires was entitled to $43,959.77 in back pay (with interest at the statutory rate) and $9202 in front pay through 2000.

The ALJ also concluded Sires should have $7500 to compensate her for the emotional distress resulting from VMI's discriminatory actions. In addition, VMI was ordered to pay the costs of the proceeding and Sires' attorney fees. As a final measure, the ALJ required VMI to establish (1) job descriptions, and (2) written policies for transfers, promotions, demotions, wage increases, and wage decreases. The Commission adopted the ALJ's proposed decision in its entirety.

Both parties sought judicial review. VMI challenged the Commission's finding of discrimination, its finding of constructive discharge, its award of damages for emotional distress, and its remedial order. Sires claimed the agency erred in its calculation of front pay and back pay, the award for emotional distress was inadequate, and the agency should have awarded punitive damages. The district court found no error in the Commission's ruling with one

exception: the court concluded there was not substantial evidence to support the Commission's finding that Sires was constructively discharged. The district court viewed Sires' complaint as focusing on "a promotional decision," not "working conditions as such." The court also believed Sires had not given VMI "any opportunity to work on the problem before she quit." Notwithstanding the court's conclusion that Sires voluntarily resigned, the district court affirmed the Commission's award of back pay and front pay.

VMI appealed and Sires cross-appealed. Because VMI conceded on appeal that there was substantial evidence to support the Commission's finding of sex discrimination, the only issues on appeal concerned the proper measurement of Sires' damages. VMI first claimed the court erred in affirming the back pay and front pay awards in view of its determination that Sires was not constructively discharged. VMI contended Sires' damages resulting from the company's discriminatory promotion decision ended when she voluntarily terminated her employment. VMI again challenged the emotional distress damages and the agency's remedial order. Sires filed a cross-appeal, contending the district court erred in ruling she was not constructively discharged. She also asserted the Commission had incorrectly calculated her damages and had erroneously failed to award punitive damages.

We transferred the appeal to the court of appeals. That court affirmed the district court's decision, with the exception of the front pay and back pay awards. Because the court agreed there was no constructive discharge, it held Sires' earnings loss was to be measured by the difference between what she would have earned at VMI had she not quit and what she should have earned as a local leader. Relying on Meyers' testimony that $50,000 was in the range for a local leader position, the court of appeals decided it would violate the Equal Pay Act to assume, as the Commission did, that Sires would be paid only $31,140 in the local leader position. It concluded, therefore, that the Commission's damage calculation was in violation of law and must be modified. The court of appeals held the $50,000 figure paid other local leaders should be the baseline against which Sires' loss should be measured. Accordingly, it recalculated Sires' damages on the basis of the difference between what she earned in the year before her resignation ($29,140) and what local leaders were being paid ($50,000). The court increased Sires' back pay award to $48,138.20 and her front pay award to $12,435.65.

We granted both parties' applications for further review. VMI challenges the court of appeals' decision to increase the front pay and back pay awards and claims such damages are not recoverable where the employee has voluntarily resigned. Sires raises two complaints in her application for further review: (1) the reviewing courts erred in concluding there was not substantial evidence to support the agency's finding of constructive discharge; and (2) the reviewing courts erred in ruling the Commission could not award punitive damages. Because the constructive discharge issue affects the computation of damages, we will consider that issue first and then address the other damage issues.

### III. Constructive Discharge.

The question presented is whether the district court correctly determined there was not substantial evidence to support the Commission's finding that Sires was constructively discharged. This issue is important to the measure of damages because, as a general rule, employees are entitled to back pay only when they have

been actually or constructively discharged. *Major v. Rosenberg*, 877 F.2d 694, 695 (8th Cir.1989); *Muller v. United States Steel Corp.*, 509 F.2d 923, 930 (10th Cir.1975) (noting back pay award stops upon employee's voluntary resignation); *see Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641–42 (Iowa 2000) (stating a constructive discharge carries the same legal consequences as does a termination of employment by the employer).

"Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *First Judicial Dist. Dep't of Correctional Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982). Generally, trivial or isolated acts of the employer are not sufficient to support a constructive discharge claim. *Haberer v. Woodbury County*, 560 N.W.2d 571, 576 (Iowa 1997). Rather, the "working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Id.* (citation omitted). In addition, conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem. *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir.1999); *see First Judicial Dist. Dep't of Correctional Servs.*, 315 N.W.2d at 89. On the other hand, an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir.1997). In determining whether a constructive discharge has occurred, the fact finder uses an objective standard. *Haberer*, 560 N.W.2d at 575.

In arguing Sires did not meet her burden of proof to establish that her working conditions were *objectively* intolerable, VMI asserts Sires' dissatisfaction with her employment rests on a discrete employment decision to place Meyers in the local leader position, not on any harassment in the workplace or on a hostile work environment. It argues, therefore, she could have stayed on the job and pursued her legal remedies. While it is true that Sires did not suffer harassment and did not work in a hostile environment, the discrimination that occurred was broader than a single staffing decision. There is substantial evidence that she was discriminatorily relegated to the operations side of the business where there was no reasonable likelihood of advancement into a manager position. Thus, she was foreclosed from a career path, not simply deprived of one promotion. *See Clark v. Marsh*, 665 F.2d 1168, 1174–76 (D.C. Cir. 1981) (finding constructive discharge where, although precipitating event for plaintiff's retirement was denial of a promotion, the evidence showed that coupled with "the predictable humiliation and loss of prestige accompanying her failure to obtain this particular position," the plaintiff was "locked into a position from which she could apparently obtain no relief"). For this reason, the cases cited by VMI, holding the loss of a single promotional opportunity is not a sufficient reason to quit and therefore will not support a finding of constructive discharge, are not on point. *See, e.g., Breeding*, 164 F.3d at 1160; *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 495 (8th Cir. 1996); *Wensel v. State Farm Mut. Auto. Ins. Co.*, 218 F.Supp.2d 1047, 1064 (N.D.Iowa 2002). Finally, we observe that an employee's work environment need not be literally unbearable in order to effect a constructive discharge. It is enough that the employee has no recourse within the employer's organization, *see Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356–57 (8th Cir.1997), or "reasonably believes

there is no chance for fair treatment," *see Kimzey*, 107 F.3d at 574.

Here, there was substantial evidence that a reasonable person in Sires' position would have concluded there was no opportunity for fair treatment and the resulting work environment was so difficult or unpleasant that she had no choice but to resign. As already mentioned, VMI placed Sires in the "woman's track"—operations. When she questioned the company's choice for the local leader position, she was referred for redress to Schon, the very person who made the discriminatory decision. Schon gave her no assurances that she would ever be allowed to pursue management opportunities in the sales area, but rather confirmed that the company saw her future in operations. Moreover, Schon affirmed he would make the same decision again. To add insult to injury, he expected Sires to train— "mold"—the man chosen for the job she wanted. We think this evidence supports the Commission's finding that Sires' working conditions were objectively intolerable.

 VMI also claims Sires' admission that she did not think VMI really wanted her to quit precludes a finding of constructive discharge.[3] Although it may be undisputed that VMI wanted Sires to stay on the job, this fact does not preclude a find-

ing that the company deliberately rendered Sires' working conditions so intolerable that a reasonable employee in Sires' position would resign. *See Satterwhite v. Smith*, 744 F.2d 1380, 1383 (9th Cir.1984) (rejecting view that employer's subjective intent is determinative); *Clark*, 665 F.2d at 1175 n. 8 (stating "an employer's subjective intent is irrelevant"). It is sufficient that the employee's resignation was a reasonably foreseeable consequence of the insufferable working conditions created by the employer. *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 285 (8th Cir.1993); *Clark*, 665 F.2d at 1175 n. 8 (stating the employer "must be held to have intended those consequences it could reasonably have foreseen").

Here, there was substantial evidence in the record showing Sires was denied a promotion for which she was qualified because she was a woman; that she was relegated to a position where her advancement opportunities were limited at best[4]; that she was told management would make the same decision again; and that she was asked to stay in her inferior position and train the man who had been promoted over her. We conclude these facts, all known to VMI, sufficiently support the agency's finding that it was or should have been reasonably foreseeable to the compa-

---

**3.** The evidence supports the following explanation found in the plaintiff's brief for why VMI did not want her to quit: "VMI wanted [Sires] to be a good girl, stay on the woman's track, do clerical and operations duties, and help 'mold' the man who got the job she should have gotten, into a good branch supervisor." Thus, VMI sought to keep Sires with the company, not because it was willing to address her concerns, but because it needed her to assist in implementing its discriminatory staffing decision.

**4.** Sires testified: "I felt I had nowhere to go. After [Schon] had told me … I want you to mold Bill [Meyers] into this position, I felt,

okay, you're going to have me train him up, and then I am going to be gone. I had no place to go." Sires' view of her situation was not mere paranoia. Under the company's new organizational structure, branch operations were controlled at the regional level. In fact, Sires' position as branch operations manager was not filled after she resigned. Although VMI claimed at the hearing that Sires was in line for a regional operations position, the ALJ found Sires more credible than Schon and Freilinger. Sires testified that no one mentioned the possibility of a regional position with the company in the weeks following Meyers' appointment as local leader.

ny that an employee in this situation would find her working conditions so oppressive and hopeless that resignation was the only tenable option. *See Satterwhite*, 744 F.2d at 1383 (finding constructive discharge where black employee was denied advancement opportunities and was put in embarrassing and humiliating position of training white men promoted ahead of him).

 VMI also claims Sires failed to give the company an adequate opportunity to address her grievances and so cannot rely on the constructive discharge doctrine. *See West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995) (" 'Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast.' An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." (Citation omitted.)). While Sires waited only one month before quitting, a relatively brief period, we cannot say under the specific circumstances of this particular case that she acted precipitously. A review of the evidence shows this case is not one where the company did not have sufficient time to rectify its wrong. Nor is it a case where the employee assumed the worst and jumped to conclusions too fast. Rather, this case presents a situation where the company, when given the opportunity, chose to perpetuate its discriminatory practices.

In the weeks between Meyers' promotion and Sires' resignation the company not only took no action to investigate Sires' complaints, it gave no indication that it intended to conduct an inquiry. *See Kimzey*, 107 F.3d at 575 (noting "unresponsive management" as evidence of constructive discharge). The company's indifference was further demonstrated by the fact Sires was referred to the individual who made the discriminatory promotion decision to

seek a resolution of her grievance. This individual, rather than assuring Sires that appropriate and prompt remedial action would be taken, informed her that he would make the same decision again if he had it to do over and reaffirmed that the company saw her future in operations. Given this attitude, we do not think Sires was required to stay in her subordinate job, training the man who obtained the promotion denied to her, with no promise or hope of a change in company policy, or even of a meaningful investigation into VMI's discriminatory employment practices.

In summary, we conclude the district court erred in ruling there was not substantial evidence that Sires was constructively discharged. Consequently, we reverse the district court's judgment on this issue and affirm the Commission's decision that Sires was constructively discharged from her employment with VMI.

### IV. Award of Front and Back Pay.

 This court's affirmance of the Commission's finding that Sires was constructively discharged renders moot VMI's argument that Sires was not entitled to front pay and back pay because she voluntarily quit. Our decision also means Sires' earnings loss must be computed on the basis of her actual earnings during the relevant period rather than what she would have earned at VMI had she not resigned. The only remaining issue, then, is VMI's challenge to the court of appeals' ruling that the Commission employed the wrong baseline for measuring front pay and back pay.

 In considering this issue, we first acknowledge that the calculation of front pay and back pay is "a judgment call within the province of the commission and not the court." *Hy–Vee Food Stores, Inc.*, 453 N.W.2d at 532. Nonetheless, the agency

must exercise its judgment within the framework of the legal principles governing the proof and measurement of this element of damage. Thus, our focus here is on the Commission's application of these legal principles, not its factual findings.

■■■■ We start with the proposition that absolute precision in proving what an employee would have earned but for the employer's discrimination is not required. *Id.* at 530. Furthermore, because the difficulty in determining what an employee would have earned is often the result of the employer's discriminatory wage structure, any uncertainties in computing back pay are resolved against the employer. *Id.* An appropriate yardstick for measuring damages resulting from sexual discrimination is what comparable male employees are earning. *Id.* at 531.

With these parameters in mind, we first examine the Commission's decision. The Commission observed "that there was general confusion as to the title and role of 'local leader.'" No job description had ever been prepared; these positions were not advertised or posted; and the company had no official salary range for the job. The lack of clarity in the job duties of a local leader resulted from VMI's practice of filling positions by hand-picking employees (generally men) for promotion, rather than advertising or posting such opportunities. This practice eliminated the need for formal job descriptions that could be posted and advertised. Although the parameters of the local leader position lacked precision, the record shows that Meyers, who was making $50,000 as an outside salesman, received a $2000 raise when he was made the local leader. In addition, Meyers testified that $50,000 was the general pay range for the local leader position.

The Commission concluded "[t]he only helpful evidence in computing back pay is the fact that in moving to the 'local leader' position, Meyers received $2000 more per year." It concluded, therefore, that Sires too would have received a $2000 raise had she been designated the local leader, making her salary in that position $31,140. The Commission then calculated back pay and front pay based on the difference between what Sires actually earned and the $31,140 she would have received as a local leader position. The Commission refused to use Meyers' $50,000 or $52,000 salary for this purpose because he was an outside salesman, which was an "entirely different job" from Sires' position as operations manager.

The error in this reasoning is the Commission's failure to apply the principle that any uncertainty in determining what a claimant would make in the new position is resolved against the employer. Here, the Commission was apparently concerned that the local leader position was not clearly defined and there was no official salary for the position. Therefore, it assumed Sires would have remained the operations manager while serving as the local leader and her operations manager responsibilities would have driven her salary, not her responsibilities as local leader. This uncertainty was clearly attributable, however, to VMI's discriminatory practices. Therefore, the Commission, rather than assuming Sires would have been paid less than other local leaders because of her operations duties, should have resolved this lack of clarity against the company. *Id.* (suggesting that where difficulty in determining damages arises from employer's discriminatory conduct, the fact finder should resolve uncertainties against the employer, relying on just and reasonable inferences).

We agree with the court of appeals (though for a different reason) that once the Commission found Sires had been denied the local leader position on the basis of sex, it was the salary earned by local leaders that should have provided the

baseline against which her loss was measured. The record was undisputed that the salary range for local leaders was $50,000, and that Meyers earned $52,000 in this job. Thus, Sires' earnings loss should have been measured by the difference between her actual earnings and $52,000, the sum earned by Meyers in the position discriminatorily denied to Sires. *See EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992) (affirming district court's decision to use "the salary for the position comparable to the one the claimant was unlawfully denied" as the baseline to determine the back pay award); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir.1985) (requiring defendant, who had discriminatorily failed to promote the claimant, to pay damages based on the highest salary paid to persons holding position denied the claimant); *Grimes v. Athens Newspaper, Inc.*, 604 F.Supp. 1166, 1167 (M.D.Ga.1985) (measuring damages of female copy editors by highest amount paid male employees doing the same work). Because the Commission did not properly apply the rules governing the computation of front pay and back pay, its calculation of these damages must be corrected. Measuring Sires' earnings loss using the sum paid to Meyers as a baseline, her back pay award must be increased to $94,104 and her front pay award to $21,638.[5]

## V. *Punitive Damages.*

 Sires complains about the Commission's failure to award punitive damages, but concedes that punitive damages are not available under the Iowa Civil Rights Act. In *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Commission*, 394 N.W.2d 375 (Iowa 1986), this court applied the "general rule ... that an administrative agency cannot award punitive damages absent express statutory language allowing such an award." 394 N.W.2d at 384. We held, therefore, that because the Iowa act did not give the Iowa Civil Rights Commission the express authority to award punitive damages, the commission had no power to do so. *Id.* The same reasoning obviously applies to the Mason City Human Rights Commission. *Cf. Quaker Oats Co. v. Cedar Rapids Human Rights Comm'n*, 268 N.W.2d 862, 868 (Iowa 1978), *superceded by statute on other grounds as stated in Gray v. Kinseth Corp.*, 636 N.W.2d 100, 102 (Iowa 2001) (holding local human rights commission lacked authority to order class action relief because there was no power to do so conferred in the Iowa Civil Rights Act or the local ordinance creating the commission). Therefore, it too has no authority to award punitive damages under the Iowa act.

Sires argues, however, that because she also filed her complaint with the EEOC, the Commission should be able to award punitive damages as permitted by federal civil rights law. Sires' argument ignores the limited jurisdiction of this local civil rights commission. Under Iowa Code sec-

---

**5.** We have calculated back pay and front pay based on the time periods deemed appropriate by the Commission and using the earnings and projected earnings figures determined by the agency. For 1998, Sires' actual earnings of $10,993 were subtracted from $52,000, leaving lost earnings of $41,007 for that year. For 1999, actual earnings of $13,561 were subtracted from $52,000, for lost earnings of $38,439. For the first twenty-one weeks of 2000, actual earnings of $6,342 were subtracted from $21,000, for a loss of $14,658. (The hearing on Sires' claim was in May 2000.) Adding together these amounts produces total back pay of $94,104. Front pay was determined by subtracting Sires' projected earnings for the remainder of 2000 ($9362) from $31,000, resulting in a front pay award of $21,638.

tion 216.5, the Iowa Civil Rights Commission is given the power to determine complaints alleging an unfair or discriminatory practice *under Iowa Code chapter 216.* *See* Iowa Code § 216.5(2); *see also id.* § 216.2(13) (defining "[u]nfair practice" and "discriminatory practice"). In addition, a city may create a local civil rights commission to protect the rights of citizens secured by the Iowa Civil Rights Act. *Id.* § 216.19. Thus, the Commission in this case acted under the authority and subject to the limitations of chapter 216, not federal law. Therefore, it correctly determined that it had no power to award punitive damages.

### VI. *Conclusion and Disposition.*

There was substantial evidence to support the Commission's finding that Sires was constructively discharged from her employment with VMI. The district court erred in ruling to the contrary and accordingly we reverse that part of the court's judgment.

The Commission erred in resolving ambiguities with respect to the job duties and corresponding salary of local leaders against Sires. This uncertainty should have been resolved against VMI. As a result, the Commission erred in failing to use the salary of the man who was promoted into the local leader position over Sires to calculate the wages Sires lost as a result of her employer's discriminatory conduct. Therefore, we reverse the district court's order affirming the Commission's award of front pay and back pay, and remand for entry of an order recalculating these damages as outlined above.

We otherwise affirm the district court's decision, including its ruling that the Commission had no authority to award punitive damages.

Sires requests an award of her attorney fees on appeal. *See* Iowa Code § 216.15(8)(*a*)(8) (providing a successful complainant may recover damages, including "reasonable attorney fees"). Therefore, on remand, the district court shall conduct a hearing on this issue and determine the amount of appellate attorney fees to which Sires is entitled. *Lynch v. City of Des Moines,* 464 N.W.2d 236, 241 (Iowa 1990); *See Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 898–99 (Iowa 1990); *Lynch v. City of Des Moines,* 464 N.W.2d 236, 241 (Iowa 1990).

**DECISION OF COURT OF APPEALS VACATED. DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED WITH DIRECTIONS.**

All justices concur except CARTER and WIGGINS, JJ., who take no part.