# IN THE COURT OF APPEALS OF IOWA

No. 21-0864
Filed July 20, 2022

**DAWN STANSBURY,**
 Plaintiff-Appellant,

**vs.**

**SIOUX CITY COMMUNITY SCHOOL DISTRICT, PAUL GAUSMAN, KIM BURYANEK and BRIAN BURNIGHT,**
 Defendants-Appellees.
_____

 Appeal from the Iowa District Court for Woodbury County, Duane E. Hoffmeyer, Judge.

 A plaintiff appeals from a grant of summary judgment against her in her sex-discrimination case. **AFFIRMED.**

 Jordan Hutchinson of Hutchinson Law Firm, P.L.C., West Des Moines, and Blake Parker, Clinton, for appellant.

 Zachary D. Clausen and Douglas L. Phillips of Klass Law Firm, L.L.P., Sioux City, for appellees.

 Heard by Tabor, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

Missing the tie between her sex and the change in her employment status, the district court summarily dismissed Dawn Stansbury's claim for sex discrimination. Stansbury, a former administrator in the Sioux City Community School District (the District), asserts she was constructively discharged from her position on the basis of her sex. At the onset, because she failed to demonstrate she was subjected to intolerable working conditions, we affirm the district court's grant of summary judgment on her constructive discharge claim. Even taking the record in the light most favorable to Stansbury, we agree with the district court that she provided only indirect evidence that the District took adverse employment action against her on the basis of sex. And, even assuming she established a prima facie case of sex discrimination, she could not show the reasons the District provided for her transfer were pretextual.

**I. Facts.**

Stansbury began teaching in the District in 2001 and was promoted to principal at an elementary school in 2005. By 2008, Stansbury starting serving as principal of Washington Elementary School. Then, in 2014, the District decided to merge Washington with Whittier Elementary School to form Morningside Elementary, with Stansbury at the helm. The shift was not smooth, and the schools' populations and employees struggled to adjust to the change in location and melding of staffs.

To make matters worse, a growing concern at Morningside was violent student behavior, such as students throwing chairs or biting other students and teachers. Stansbury attempted to discuss the issue with District administrators but

was told only that her teachers should not try to restrain students. To help, the teachers and administrators were also expected to complete MANDT training, which is a de-escalation and physical-restraint training. As of March 2017, the Morningside employees, including Stansbury, had completed no such training. The District's director of learning supports sent an email to Stansbury on March 28 and included Brian Burnight, the District's director of elementary education and Stansbury's supervisor, in the message to relay concerns about the lack of training.

In March 2017, Stansbury was placed on a plan of awareness—a precursor to a plan of assistance, which can result in disciplinary action. The plan served to address a barrage of deficiencies, including mismanaging communication with staff before a planned leave, missing a professional development meeting because she was double-booked, and failing to correct the school's declining reading scores. When Stansbury and Burnight went over the plan, Stansbury told Burnight she felt there was a "target on her back," and Burnight responded that he understood why she would feel that way. Stansbury completed her plan within three months.

During the following school year, Stansbury disciplined a special-education teacher who had failed to keep state-required data relating to students with individual learning plans. The teacher filed a harassment complaint against Stansbury, which the District investigated before concluding it was unfounded. Stansbury met with Associate Superintendent Kim Buryanek; the District's director of student services and equity education, Jen Gomez; and Burnight to go over the results of the investigation. Buryanek told Stansbury at that meeting there were concerns among the Morningside staff, including that Stansbury showed favoritism

to those who had worked at Washington over those from Whittier—Buryanek went as far as to say the principal position was no longer the best fit for Stansbury. The complaints were discussed vaguely, so Stansbury requested a more in-depth survey of the staff be conducted in 2018 to gather feedback. The feedback was not all positive and identified problem areas with Stansbury's role as principal.

In March of 2018, Burnight told Stansbury she had a choice—she could take a reassignment as a middle school assistant principal or resign. The new position would have the same pay and work the same hours, though with less responsibility and control. According to Stansbury, Burnight informed her that as long as Paul Gausman was superintendent, she probably would not be restored to a head-principal position and he did not expect her to receive a raise. Burnight denied making these statements. Seeing this as a demotion, Stansbury continued working as principal until June, when she took leave until she eventually resigned in August.

After Stansbury was informed of her expected transfer, a hiring committee (Committee) gathered to interview candidates to be the Morningside principal; the Committee included Burnight. Two women and one man were interviewed. In a deposition, Stansbury alleged that two committee members told her Burnight said he preferred the male candidate because "a man would be better at dealing with student behaviors." Ultimately, the man was hired.

Following her resignation, Stansbury filed a complaint with the Iowa Civil Rights Commission alleging demotion, harassment, and undesirable assignment/transfer due to her age and sex. Then, in February 2019, Stansbury filed suit against the District, Gausman, Buryanek, and Burnight for sex

discrimination alleging a violation of the Iowa Civil Rights Act (ICRA).[1]  The defendants moved for summary judgment, asking that Stansbury's claim of sex discrimination be dismissed.

The district court found that Stansbury presented sufficient evidence to raise a question of material fact whether the decision to transfer her to an assistant principal role was an adverse employment action but that Stansbury failed to show direct evidence of sex discrimination.  In reaching that determination, the court considered the depositions of the two Committee members Stansbury alleged told her about Burnight's comments.  In the depositions, one committee member testified she had no recollection of Burnight saying anything about preferring a man; the other committee member testified Burnight said no such thing and she never told Stansbury he did.  Concluding she only had indirect evidence, then, the court granted summary judgment because she had not generated evidence to show the reasons provided for her transfer were pretext for sex discrimination.  The district court also determined that, while she had generated a factual dispute over whether her transfer was an adverse employment action, she could not show as a matter of law that she was constructively discharged.

Stansbury timely appealed.

**II. Standard of Review.**

Our review of a grant of summary judgment is for correction of errors at law. *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019).  A grant of summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving

---

[1] Stansbury also had a number of other counts that she voluntarily dismissed.

party, "shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; Iowa R. Civ. P. 1.981(3). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Hedlund*, 930 N.W.2d at 715 (citation omitted). Our review, then, concerns only "whether a genuine issue of material fact exists and whether the district court correctly applied the law." *Id.* (citation omitted).

### III. The Sex Discrimination Claim Under ICRA.

Stansbury pushes the point that summary judgment is inappropriate because she established genuine issues of fact showing her sex as a motivating factor for the decision to transfer her to assistant principal.[2] Thus our review is "limited to whether a genuine issue of material fact exists and if the district court correctly applied the law." *Hedlund*, 930 N.W.2d at 715. We first answer the question of whether Stansbury was constructively discharged as a matter of law. Then we will turn to her claim of discrimination on the basis of her sex as involved in what she characterizes as a demotion.

A. *Constructive Discharge.*

Stansbury resigned from the District on August 14, 2018. In March 2018 she was told about the District's decision to re-assign her as an assistant principal, but she never started the new position and never signed her contract. Her letter

---

[2] Stansbury maintains the order to transfer or resign was actually a constructive discharge. *See Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 591 (Iowa 2017) ("Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (citation omitted)).

of resignation noted she resigned "in duress." The District asserts this is a "quit and sue" scenario. *See Haskenhoff*, 897 N.W.2d at 591 (noting an employee cannot simply "quit and sue," claiming constructive discharge). The District also maintains that its reasons for her transfer, to help her "learn and develop in the areas of culture and climate" from the middle school administrator, are legitimate and do not support Stansbury's claim of unfair treatment. On the other side of the coin, Stansbury claims she was constructively discharged because, with the transfer to the assistant principal position, she believed she faced the prospect of never being promoted or receiving a raise.

"Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Haskenhoff*, 897 N.W.2d at 591 (citation omitted). Stansbury directs us to *Van Meter Industries v. Mason City Human Rights Commission*, where a woman, Jane Sires, was passed up for a job promotion. 675 N.W.2d 503, 508 (Iowa 2004). Believing she was overlooked because she was a woman, Sires went first to the person who was leaving the position she had applied for, then to the director of human resources, and then to the hiring-decision maker to change the decision. *Id.* She waited to receive their responses, which were disheartening. *Id.* ("During their second conversation, however, [the hiring-decision maker] told [the plaintiff] that if he had it to do over again, he would still promote [the male candidate] over her."). After hearing back from leadership, she was expected to help train the man hired for the position for which she was passed up, which convinced Sires she was treated unfairly. *Id.* at 512–13. The Iowa Supreme Court found Sires was constructively discharged. *Id.* at 513.

Promoting a similar argument, Stansbury claims she also was constructively discharged by the District when she was given no choice but to accept the assistant principal position with no hope of promotion or resign. *See Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641–43 (Iowa 2000) (discussing constructive discharge in the context of statutory claims, such as employment discrimination); *see also Haskenhoff*, 897 N.W.2d at 591 (allowing constructive discharge to amount to adverse employment action). Yet unlike *Van Meter,* Stansbury made no attempt to address her concerns through appropriate channels in the school district—such as the grievance process.[3] And "[c]ourts have consistently required 'something more' for constructive discharge claims than for ordinary discrimination or retaliation." *Haskenhoff*, 897 N.W.2d at 597 (noting the viewpoint is from that of a reasonable person, not how the plaintiff feels). A successful constructive-discharge claim requires more than "trivial or isolated acts of the employer." *Van Meter Indus.*, 675 N.W.2d at 511. "Rather, the 'working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable.'" *Haskenhoff*, 897 N.W.2d at 591 (citations omitted). And, the employer must be "given a reasonable chance to resolve the problem." *Van Meter Indus.*, 675 N.W.2d at 511. "An employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. . . . The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Haberer v. Woodbury Cnty.*, 560 N.W.2d 571, 575 (Iowa 1997).

---

[3] Stansbury had earlier worked with the director of the human resources department, knew her well, and found her "honest" and "trustworthy."

After giving the employer time, however, an employee need not wait around if they "reasonably believe[] there is no chance for fair treatment." *Id.*

But, in the light most favorable to Stansbury, she relied upon the word of one individual in assuming her pay would be frozen regardless of performance. *See Haskenhoff*, 897 N.W.2d at 595 ("To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." (citation omitted)). And while she claims her supervisor told her that she would never get a promotion or a raise, Stansbury elected to resign rather than take her complaints up the chain such as to the personnel office. *See Van Meter Indus.*, 675 N.W.2d at 511–12 (constructive discharge results when "employee has no recourse within the employer's organization."). Unlike *Haskenhoff*, Stansbury did not reach out to the human resources department or the school board—to give the District a reasonable opportunity to explain how her pay or tenure might be impacted—before resigning. *See* 897 N.W.2d at 594-95. Without having taken the new assistant principal job, she cannot point to conditions so intolerable as to constitute constructive discharge—as theoretical intolerability premised on suppositions cannot amount to unusually aggravated working conditions that would cause a reasonable person to quit. *See First Jud. Dist. Dep't of Corr. Servs. v. Iowa C.R. Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982) (requiring a showing "that 'working conditions would have been so difficult or unpleasant' that a reasonable person in the employee's position would be compelled to resign." (citation omitted)). As a matter of law, considering the record in the light most favorable to Stansbury, she failed to show she was constructively discharged. Thus, the

reassignment to the middle school assistant principal job defines her remaining claim of adverse employment action in our analysis.

 B. *Proof of Discrimination—General Concepts.*

To frame its analysis, the district court set out:

> A female employee [such as Dawn] must establish the following elements in order to set forth a claim for disparate treatment discrimination, based on sex or gender . . . 1) that she belongs to class of persons protected by Title VII [ICRA], e.g., sex or gender; 2) that she was qualified for the job, and performing the job satisfactorily; 3) that she experienced an adverse employment action; and 4) that similarly situated individuals outside of her protected class, e.g., sex or gender, were treated more favorably, or other circumstances surrounding the adverse employment action giving rise to inference of discrimination.

(Alterations in original) (ellipsis in original).

The district court found "no sufficient direct evidence for a material fact dispute that the District's decision was motivated by sex discrimination." As for the prima facie case, the district court proceeded under the assumption there was sufficient evidence to support an inference of the District's discrimination against Stansbury because of her sex, but concluded that Stansbury failed to generate a "fact dispute that the District's nondiscriminatory reason for the transfer was pretext for sex discrimination." To check this conclusion, we start with Iowa's statute. Under the ICRA, it is "an unfair or discriminatory practice . . . to discharge any employee, or to otherwise discriminate in employment . . . because of . . . sex." Iowa Code § 216.6(1)(a) (2019).

A plaintiff can prove sex discrimination by direct or indirect evidence. *Hedlund*, 930 N.W.2d at 719. As our supreme court said:

> The *Price Waterhouse* method is used when direct or circumstantial evidence is presented which tends to establish age was a

determining factor in the employment decision. *Price Waterhouse* [*v. Hopkins*, 490 U.S. 228, 258 (1989)]. The *McDonnell Douglas* method is an indirect burden shifting framework. *McDonnell Douglas* [*v. Green*, 411 U.S. 792, 802–03 (1973)].

*Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538 (Iowa 1996). On the direct evidence track, "[a]fter the direct evidence has been presented [by the plaintiff], the employer then bears the burden of establishing by a preponderance of the evidence it would have made the same decision even in absence of the improper motive." *Id.* at 538–39. But direct evidence of a discriminatory motive is rarely trumpeted by the employer and is almost never available. *See Godfrey v. State*, 962 N.W.2d 84, 123 (Iowa 2021) (Appel, J., dissenting).

If the plaintiff offers only indirect evidence, courts follow the framework established in *McDonnell Douglas*.[4] Under this framework, the initial burden is on the plaintiff to establish a prima facie case of sex discrimination, identifying an adverse employment action. *Hedlund*, 930 N.W.2d at 720. "'The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its

---

[4] Stansbury invites our court to do away with the *McDonnell Douglas* test, citing a string of policy reasons. While she believes our court should have no reservations about ringing the test's death knell, our supreme court precedent would disagree. The test was re-affirmed for summary judgments—as opposed to jury determinations—in Iowa as recently as 2019. *See Hedlund*, 930 N.W.2d at 719 n.8. ("In *Hawkins v. Grinnell Regional Medical Center*, 929 N.W.2d 261, 272 (Iowa 2019), where an age discrimination case went to trial, we held that 'we no longer rely on the *McDonnell Douglas* burden-shifting analysis and determin[ing]-factor standard when instructing the jury.' We did not disturb our prior law as it applies to summary judgment."). The supreme court declined to disturb our existing law, and we will not take up the cause in their stead. *See id.* at 719 ("The parties disagree as to the appropriate analytical framework the district court should employ at the summary judgment stage. . . . We do not need to decide this issue because, either way, we conclude that Hedlund has failed to raise a genuine issue of material fact."); Iowa R. App. P. 6.1101(3) (allowing "[c]ases presenting the application of existing legal principles" and "[c]ases presenting issues that are appropriate for summary disposition" to be transferred to our court).

employment action." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If this burden is satisfied, the plaintiff has the burden to show the alternate reason presented is merely pretext for the alleged discrimination. *Id.* This includes proving "that the discriminatory motive played a substantial part in the actions taken." *Vaughan*, 542 N.W.2d at 538.

Stansbury claims she proved disputed facts avoiding summary judgment under both the direct-evidence and indirect-evidence avenues.

*Direct Evidence Test.*

Stansbury contends statements made by Burnight during the hiring process of her successor, after Stansbury was told she needed to take the job in the middle school or resign, is direct evidence of sex discrimination against her. A party can avoid summary judgment with proof of direct evidence. *See Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809 (8th Cir. 2007). Evidence is direct when it "show[s] a specific link between the alleged discriminatory animus and the challenged decision." *Hedlund*, 930 N.W.2d at 719 n.7 (alteration in original) (citation omitted). In other words:

> the plaintiff must present "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision."

*Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (citation omitted). "'[D]irect' refers to the causal strength of the proof, not whether it is circumstantial evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "'[S]tray remarks in the workplace,' 'statements by nondecisionmakers,' and 'statements by decisionmakers unrelated to the decisional process' do not

constitute direct evidence." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) (quoting *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152 (8th Cir. 2007)).

For her direct evidence, Stansbury offers her deposition where she describes how two separate Committee members told her Burnight made comments during the hiring process for her replacement that "a man would be better at dealing with student behaviors." She speculates the decision to transfer her came because Burnight felt a man would better handle the student discipline at the elementary school—thus this direct evidence shows she was discriminated against because of her sex. Stansbury argues Burnight's discriminatory attitude surely played a part in her transfer. *But see Price Waterhouse*, 490 U.S. at 251 ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision."). The district court concluded Stansbury showed no evidence of a similar statement in the earlier decision-making process over her transfer or, even if true, no evidence connects sex as a motiving factor for Stansbury's change of assignment.

We dig deeper into this theory. At best, Stansbury offers hearsay statements made by women serving on the Committee for her replacement. Yet Stansbury testified only Committee members Kim Brown and Susan Jordan confirmed the statement to her. When those women were deposed, Brown denied telling Stansbury that Burnight made the statement and affirmatively stated that Burnight cut off any reference to hiring a man by saying "it was not appropriate." Jordan's memory, while less clear, did not specifically point to Burnight, but did address feelings that she believed *she* voiced that a male might be best for the

school at that time.[5] But two other female members of the Committee, Becky Gaul and Lori Evers, confirmed that while such a statement was made by a committee member, Burnight shut down that consideration. Gaul also offered that Burnight never voiced an opinion about any candidate but let the committee talk about each applicant. And the committee members closely scored the two women candidates and the male candidate after the interviews and before the discussion.[6] If, as all Committee members testified, persons other than Burnight made the statement about a male choice, Stansbury has not connected the person making the decision about her transfer with the discriminatory statement she offers as direct evidence.[7]

Where there are competing narratives, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1126 (S.D. Iowa 2007) (citation omitted). Instead, it takes two or more sides of a factual dispute each supported by evidence to metamorphose a generic factual dispute into a "genuine" one. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (rejecting a motion for summary judgment requires that "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party"). And the hiring process and these statements occurred after

---

[5] Jordan did not take part in making the decision to transfer Stansbury to assistant principal, so Jordan's stated belief that a man might be better suited for the job would not reflect a discriminatory attitude that was involved in the adverse employment decision.

[6] Burnight scored the male candidate only one point higher than his scores for the female applicants.

[7] All three candidates scored so closely that they all were interviewed by Gausman before the male candidate, who scored the highest across the group, was chosen.

the decision was made to transfer Stansbury to the assistant principal position—so there is not a direct link between the adverse employment decision and the comments. For the new position, two of the candidates interviewed were women, with only one male candidate. All three made it through to the final interviews. The scoring of the finalists for the elementary principal post was extremely close between the candidates, irrespective of sex and; in particular, Burnight ranked the women only one point lower than the male candidate where some of the female members votes showed a wider spread.

In its summary judgment order, after reviewing the contradicted evidence provided, the district court found the statement, if made, was insufficient to show sex was a motivating factor in the earlier decision to transfer Stansbury to the middle school job. Stated another way, Stansbury provided no direct evidence linking the decision to transfer her to a different position to her sex. *See Richardson v. Sugg*, 448 F.3d 1046, 1058 (8th Cir. 2006) (noting "stray remarks, statements by nondecisionmakers, or statements by decisionmakers that are unrelated to the decisional process" do not meet the required causal link of proof). We agree with the district court and do not find sufficient direct evidence, of the strength required, that Stansbury's sex motivated the employment decision to transfer her.

The District argues that, even if Stansbury provided direct evidence, we should afford it the benefit of the same-decision defense.[8] *See Vroegh v. Iowa*

---

[8] Stansbury argues the District did not preserve error on the same-decision defense because, though the District raised the issue to the district court, the district court's decision does not address it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues

*Dep't of Corr.*, 972 N.W.2d. 686, 696 (Iowa 2022) ("[T]he same-decision defense permits the employer to avoid liability if it proves by a preponderance of the evidence that it would have made the same decision even if it had not taken the protected characteristic into account. In other words, notwithstanding evidence that the employer impermissibly took the employee's protected characteristic into account in its decision, the employer may avoid liability if the employer can show it had a second, separate reason unrelated to the employee's protected characteristic that provides a lawful basis for the decision." (internal citation omitted)). On this defense, the District lists several reasons for its decision to transfer Stansbury to the middle school position. First, Stansbury received four "True Speaks," which the District characterizes as disciplinary write-ups, in the two years before the transfer.[9] Ultimately, the District placed her on a plan of awareness involving issues over her leadership and the school's performance. While investigating an employee's harassment claim against Stansbury, the District obtained negative feedback about Stansbury from several staff in the building. After Stansbury requested an evaluation be conducted from her staff on her performance, those responses supported the testimonial complaints. Lastly, the District observed Stansbury's administrator evaluations showed declining

---

must ordinarily be both raised and decided by the district court before we will decide them on appeal."). But, "[a] successful party, without appealing, may attempt to save a judgment on appeal based on grounds urged in the district court but not considered by that court." *Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993).

[9] The True Speaks included a note on April 4, 2016 for a failure to communicate with staff, on November 15, 2016 for failing to attend a professional development meeting, and on March 28, 2017 for failing to complete MANDT training for staff and administration. Also in March 2017, the district placed Stansbury on a Plan of Awareness, addressing low reading scores and Stansbury's work hours.

performance on several criteria, including the culture of learning standards and her management skills. Because of these factors, the District argues it had a performance-centric rational for the transfer decision. The district court found with that background, the District met its burden to show legitimate reasons for transferring Stansbury—unmotivated by any discriminatory factor. We agree.

*Indirect Evidence: Burden-Shifting Test.*

Even if Stansbury could not show direct evidence of sex discrimination, her burden to prove a prima facie case could be met using indirect evidence. *See Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (observing that the proof threshold to establish a prima facie case is minimal). Even after affording her the benefit of the doubt that she established a prima facie case of sex discrimination, the district court examined her theories but determined Stansbury failed to generate a fact dispute that the District's nondiscriminatory reasons were pretext for sex discrimination.

If the party offers only indirect evidence, courts follow the framework established in *McDonnell Douglas*. Under this framework, the initial burden is on the plaintiff to establish a prima facie case of sex discrimination, identifying an adverse employment action. *Hedlund*, 930 N.W.2d at 720. "'The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action.'" *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). If this burden is satisfied, the plaintiff has the burden to show the alternate reason presented is merely pretext for the alleged discrimination. *Id.*

Even if we assume, as did the district court, that Stansbury met the elements of a prima facie case of discrimination, we still see legitimate reasons for

the transfer. With the concerns over her evaluation and disciplinary issues, the decision to transfer Stansbury to the middle school for training and guidance over culture and climate represents a legitimate nondiscriminatory reason for the employment change. After the reason for the action is articulated as nondiscriminatory, Stansbury must show the reason is merely pretext for the sex discrimination by the District. To show the discriminatory motive played a substantial part in the actions taken against her, Stansbury describes a "pattern of discrimination" in the District.[10] She faults the District for not allowing her additional chances or not supporting her requested needs as well. But we are not a "super-personnel department." *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (noting that in discrimination matters courts have no power "to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). Instead, we focus our inquiry here on whether the facts raised by Stansbury are sufficient to allow her to submit her claim to a jury because they suggest the District's proffered reasons for the transfer were fabricated. Part of her claim characterizes the treatment of male principals in the District as more favorable than that of the women principals.[11] With several comparators identified, Stansbury argues the males were similarly situated

---

[10] In the summary judgment briefing, the District noted that 60% of the District's principals are women.

[11] Stansbury produced affidavits from various women who worked for the District in years past, but those individual situations did not rebut the hiring pattern evidence that from 2008-2018, of the forty-six administrators hired by the District, twenty-six were female and twenty were male. Ten were elementary school principals, with seven being female, and eleven being male.

coworkers that were not subject to the same standards as her. But the standard for determining whether employees are similarly situated is rigorous at the pretext stage. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012). Furthermore, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" *Harvey v. Anheuser-Busch*, *Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (citation omitted). We agree with the district court that the situations involving the male counterparts did not involve similar circumstances, were easily distinguishable from her situation,[12] and were not conclusive evidence of disparate treatment of women principals as opposed to the male principals.

Finding no obvious connection that Stansbury's sex motivated the transfer, we look to see if the District's reasons are mere pretext. As noted above, during the harassment investigation, the District received complaints about Stansbury from several employees that included a laundry list, including these comments:

        Things have to be swept under the rug
        Phrase things a certain way
        People pleaser/does not hold others accountable
        Communication is poor
        Lack of understanding
        No clear processes
        Fear of retaliation
        No leadership/not effective
        Disengaged/unsupportive
        Just wants to look good/puts on a show
        Does not hold staff accountable/no follow through
        Climate is bad

---

[12] Some of the identified comparators had not been in the District as long as Stansbury, were overseeing schools with higher reduced lunch populations (thus getting more help than Stansbury's school), or had other factors supporting the District's human resource decisions regarding those employees. And two of those named by Stansbury were reassigned from a principal role to that of assistant principal.

Cliques/Favoritism
No trust
No motivation
Not uplifting
Dark place to work

After compiling those comments and after Stansbury requested the 2018 evaluation, the District confirmed problems with Stansbury's approach to culture and climate in the building and with her management of staff. Thus, the transfer decision represented a performance-centric choice to address the information gleaned from the evaluation. With the record viewed as a whole we cannot find that the reasons given by the District were pretextual or that the decision to transfer was based upon unlawful criteria. *See Woodbury Cnty v. v. Iowa C.R. Comm'n*, 335 N.W.2d 161, 166 (Iowa 1983) (finding as a matter of law there was substantial evidence in the record of other legitimate reasons for not hiring complainant).

We find Stansbury's evidence insufficient to support her claim of pretext.

**IV. Conclusion.**

We affirm the district court ruling on summary judgment, dismissing Stansbury's claim of sex discrimination.

**AFFIRMED.**