# IN THE COURT OF APPEALS OF IOWA

No. 14-1106
Filed April 22, 2015

**CARRIE WRIGHT,**
        Plaintiff-Appellant,

**vs.**

**ROSS HOLDINGS, LLC**
**and SHANNON SCHMIDT,**
        Defendants-Appellees.

_____

        Appeal from the Iowa District Court for Black Hawk County, Kellyann M.

Lekar, Judge.


        A plaintiff appeals the trial court's grant of summary judgment for the

defendants in sex discrimination case. **AFFIRMED.**


        Joseph G. Martin of Swisher & Cohrt, P.L.C., Waterloo, for appellant.

        Lisa A. Stephenson of Simmons, Perrine, Moyer & Bergman, P.L.C.,

Cedar Rapids, for appellees.


        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**MULLINS, J.**

Carrie Wright filed suit, claiming she was sexually harassed by Mike Day, Shannon Schmidt, and Phil Marlow while she was employed at Ross Marketing, Inc., and its successor Ross Holdings, LLC. The trial court granted summary judgment in favor of Schmidt and Ross Holdings because it found no genuine dispute of material fact regarding Wright's hostile work environment claim or successor liability between Ross Marketing and Ross Holdings.

Wright appeals the trial court's grant of summary judgment of her hostile work environment claim, claiming material facts exist that demonstrate her work environment was so hostile it affected a term or condition of her employment. Wright also appeals the grant of summary judgment of her successor liability claim, arguing substantial continuity existed between Ross Holdings and Ross Marketing, and Ross Holdings was on notice of her claim due to her complaints to her supervisor.

## I.    Background Facts & Proceedings

Carrie Wright began working at Ross Marketing's telemarketing site in Cedar Falls in 2000, where she was visited once or twice a month by her supervisor, Mike Day, who was employed in Ross Marketing's Hiawatha office. Day would talk with Wright for five minutes or so about her employment. Approximately half the time Day visited Cedar Falls, he invited Wright and other employees to get drinks after work, which Wright declined. Wright asserts Day often sat next to her and stared at her chest. On one occasion, Day stared at Wright's chest, said, "I like the color of your eyes," started laughing, and walked

away. Wright told her coworker, Jodi Payne,[1] about Day's conduct. Day's employment with Ross Marketing ended in May 2006.

Shannon Schmidt worked as a supervisor in Ross Marketing's Cedar Falls site from December 2004 to April 2006. She began working at the Hiawatha office in 2006, and she only spent a few hours a week at the Cedar Falls site thereafter. Wright complained to Schmidt once about Day's conduct sometime in 2004 or 2005. At approximately the same time, Schmidt and other employees began calling Wright "blue eyes," which Payne told her meant that people did not know the color of her eyes because they were looking at her breasts. Wright complained about the nickname, "blue eyes," to Schmidt and another coworker, Kally Kurth,[2] once in 2004 or 2005, but none of the employees stopped using the nickname. Wright never complained about it again.

By 2008, Ross Marketing was financially unstable. When Ross Marketing defaulted on its obligations to the State Bank of Lawler, the bank assigned its notes and security to Ross Holdings. Ross Holdings negotiated with Ross Marketing to accomplish an asset transfer in lieu of foreclosure as a means of satisfying some of Ross Marketing's debt. Ross Holdings was formed in 2008 by Robert Silhacek and Michael Fox. Brian Bunting, the owner of Ross Marketing, has never had an interest in Ross Holdings.

---

[1] Payne's employment with Ross Marketing ended February 2008. She was never employed by Ross Holdings. Wright asserts Payne had been a supervisor at Ross Marketing; Ross Holdings disputes this.
[2] Wright asserts Kally Kurth was a supervisor; Ross Holdings disputes this.

Ross Holdings negotiated and signed new leases for its facilities; renegotiated business agreements with Ross Marketing's clients and affiliates; and changed at least some of Ross Marketing's sales processes, service offerings, employee training systems, product inventory, and licensure requirements for employees. It also sent a letter to all Ross Marketing employees, stating it would be operating Ross Marketing in "new and exciting ways," that their employment with Ross Marketing was now terminated, that Ross Holdings would not assume any employment obligations of Ross Marketing, and that each employee could re-apply for their job with Ross Holdings.

Robert Silhacek affirmed in an affidavit that Ross Holdings inquired into Ross Marketing's potential liabilities, including potential employment claims, and had no knowledge of any complaints pertaining to Wright at the time of the acquisition. Wright disputes this. After the transition, twenty percent of employees were retained by Ross Holdings, Schmidt was promoted to Ross Holdings's director of operations, and Wright remained in the Cedar Falls office.

Wright's coworkers and Schmidt had continued to refer to Wright as "blue eyes" since 2004 or 2005. Ross Holdings then hired Phil Marlow in April 2010 as the Center Manager for the Cedar Falls office. The evening of Friday, August 27, 2010, Marlow and Wright coincidentally met at a bar, their presence was not work-related. Marlow approached Wright and her friends and told Wright she was the "hottest blonde in the bar" and that she should dress up like that for work. He proceeded to buy shots for Wright's table, sit close to Wright, and rub

her back.  Wright left the table, but later Marlow approached Wright when she was outside with her cousin.  He offered to give her a ride home and, while making other sexual comments, suggested they go to his house.  At no time did Wright express she was offended by his comments.  Marlow became agitated and left upon Wright's cousin's instruction.

Upon arriving at work on Monday, August 30, 2010, Wright reported Friday's incident to her supervisor, Kristina Kennedy.  This was her first and only complaint about Marlow.  Kennedy contacted Schmidt to report Wright's complaint, and Wright was subsequently offered a leave of absence while the matter was being investigated.  Schmidt told Wright she may have an attorney contact her, which Wright interpreted as threatening.  Wright ultimately resigned her position.

Ross Holdings conducted an investigation into Friday's events, and Schmidt terminated Marlow on September 1 for violating the Ross Holdings fraternization policy.  That same day, Schmidt called Wright, explained Marlow had been terminated, and asked Wright to return to her job.  The two corresponded briefly, but Wright ultimately decided not to return.  Wright testified in her deposition she would have resigned regardless of whether Marlow was terminated, that she had no desire to resign prior to Friday's incident, and that she did so because of Marlow's conduct.

Wright filed a complaint with both the Cedar Falls Human Rights Commission and the Iowa Civil Rights Commission in October 2010.  Upon receiving an administrative release, Wright filed this lawsuit in September 2012,

asserting she was sexually harassed by Day, Schmidt, and Marlow. The trial court granted summary judgment in favor of Schmidt and Ross Holdings on all claims in February 2014.[3] In doing so, contrary to assertions by Ross Holdings, it found Ross Holdings had notice of Wright's claims given Schmidt's supervisory role with both the Ross Marketing and Ross Holdings. Nonetheless, the court declined to impose successor liability because substantial continuity did not exist between the two companies. Alternatively, the court granted summary judgment in favor of Ross Holdings and Schmidt on the hostile work environment claim because it found the conduct was neither frequent nor severe, nor was it physically intimidating, threatening, or humiliating. Wright filed an Iowa Rule of Civil Procedure 1.904 motion to amend and enlarge, which the trial court subsequently denied. Wright now appeals.

## II.  Standard of Review

We review grants of summary judgment for correction of errors of law. *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 775 (Iowa 2010). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). We view the record "in the light most favorable to the nonmoving party." *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004). "We also indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a

---

[3] Day and Marlow were dismissed from the case prior to the time of the summary judgment decision.

fact question." *Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 565 (Iowa 2000).

## III.    Hostile Work Environment Claim

To prevail on a claim of a sexually hostile work environment, plaintiff must prove: (1) the person belongs to a protected group; (2) the person was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment.  *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006). Because both Iowa Civil Rights Act (ICRA) and Title VII sexual harassment claims are analyzed under the same legal framework, Title VII cases are persuasive. *See Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 999 (S.D. Iowa 2014).

Wright asserts summary judgment was inappropriate because genuine issues of material fact exist as to element four.  Ross Holdings contends there is no genuine factual dispute regarding the alleged harassment's effect on the terms or conditions of Wright's employment as the alleged conduct was not severe and pervasive.   In the alternative, Ross Holdings asserts Wright voluntarily quit, the circumstances of which do not otherwise create a genuine factual dispute that Wright was constructively discharged.

"Where sexual harassment in the workplace is so pervasive and severe that . . . the plaintiff must endure an unreasonably offensive environment or quit working, the sexual harassment affects a condition of employment." *Lynch v. City of Des Moines*, 454 N.W.2d 827, 834 (Iowa 1990).  "To establish whether

harassment was severe or pervasive, the plaintiff must not only show he or she subjectively perceived the conduct as abusive, but that a reasonable person would also find the conduct to be abusive or hostile." *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003). "The objective determination considers all the circumstances, including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance." *Id.* at 744–45.

"'Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004) (citations omitted). It has not occurred "unless the employer has been given a reasonable chance to resolve the problem," but it is well-established that "an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly." *Id.* Such discharge can occur regardless of the employer's desire to keep the employee in their position. *See id.* at 512.

A. Constructive Discharge

Wright resigned on Monday, August 30, following her complaint to Kennedy regarding Marlow's conduct the previous Friday. Kennedy heeded Wright's complaint, communicated that an investigation would be conducted, and offered to place Wright on leave while the investigation occurred.

Notwithstanding Ross Holdings's offer to place her on administrative leave while they investigated Marlow, Wright resigned. Even after Marlow was terminated September 1, Wright refused Ross Holdings's requests for her to return to work.

Wright's situation is similar to *Brenneman v. Famous Dave's of America, Inc.*, where the Eighth Circuit held that, "Famous Dave's was investigating, proposing solutions . . . and continuing to invite [the employee] back after she resigned. In sum, she could have taken steps short of resignation to improve her working conditions, but she declined to do so." 507 F.3d 1139, 1144 (8th Cir. 2007); *see also First Judicial Dist. Dep't of Corr. Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 89 (Iowa 1982) (holding that "[employee's] immediate resignation, however, deprived [defendant] of the opportunity to investigate and remedy the situation. [The employee] was precipitous; she overreacted. We hold on the record that [defendant] did not constructively discharge her.").

Because affording Ross Holdings "a reasonable chance to work out a problem" is a prerequisite to establishing constructive discharge, and Wright failed to give Ross Holdings a reasonable chance before she resigned, we agree with the district court Wright was not constructively discharged on August 30.[4]

---

[4] In her deposition, Wright was asked, "Q. So when you left work on August 27, 2010, you had no intention of quitting; is that correct? A. That is correct. Q. You quit because of the incident that happened on August 27, 2010; correct? A. Yes." Later, Wright said, "Mike [Day], I dealt with it maybe once or twice a month when he had to come up. I'd have to deal with some comments. But with Phil, I would have to deal with him every day. So I quit and left the premises."

The reason for Wright's resignation was apparently limited to Marlow's conduct on August 27. Consequently, we do not find Wright's complaints to Schmidt—which happened five years prior—regarding Day or "blue eyes" material as to whether Ross Holdings had an opportunity to resolve her situation with Marlow. The conduct about which Wright previously complained was not the motivation for her resignation. Thus,

*See Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010); *see also Haberer v. Woodbury Cnty.*, 560 N.W.2d 571, 575 (Iowa 1997) (holding that an "employee cannot simply quit and sue, claiming he or she was constructively discharged"). We are not persuaded by Wright's argument that based on past inappropriate comments by Schmidt she believed Ross Holdings would not respond fairly. Wright did not complain to Schmidt on August 30 but to Kennedy, and Kennedy's actions before Wright's resignation were timely, responsive, and entirely appropriate.

Further, we cannot find the condition giving rise to Wright's resignation—which she stated was only based on the August 27, 2010 incident—was "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve [the] employer." *Haberer*, 560 N.W.2d at 575. Moreover, we do not find the August 27, 2010 incident to be a "continuous pattern"; rather, we find it to be an isolated act, the occurrence of which is insufficient to support her assertion she was constructively discharged. *See id.* at 576.

Finally, even if we refuse to confine the reason for her resignation to the August 27 incident and consider the events occurring during Wright's decade of employment, her adverse working conditions were not "unusually aggravated" to meet the high bar required for constructive discharge. *Id.* In her deposition, Wright acknowledged that after Day left, the only harassment she experienced until August 27 was her coworkers referring to her as "blue eyes." *See Vaughn*

---

the only complaint Ross Holdings needed an opportunity to resolve was Wright's August 30 complaint about Marlow, and it was not given that opportunity before Wright resigned.

*v. Ag Processing, Inc.*, 459 N.W.2d 627, 633 (Iowa 1990) ("Discriminatory comments that are 'merely part of casual conversation, are accidental or are sporadic do not trigger . . . sanctions.'"). Our "proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee," and Wright's ability to continue being a productive employee and ignore her coworkers' comments for years demonstrates her resignation was not coerced.[5] *See Haberer*, 560 N.W.2d at 575. We are not persuaded by Wright's assertion that Schmidt's statement about an attorney contacting her after she reported Marlow's conduct was a "threat" contributing to her adverse working conditions. Constructive discharge requires both subjective and objective considerations, and Schmidt's comment was not objectively threatening.

B. Hostile Work Environment

That is not the end of our inquiry, however, as the Iowa Supreme Court has rejected the contention that "only cases involving the loss of a tangible job benefit are actionable under the [ICRA]." *Lynch*, 454 N.W.2d at 834. Accordingly, we consider whether, irrespective of Wright's resignation, the alleged conduct was so frequent, severe, and offensive that it otherwise altered the terms or conditions of her employment.

The "existence of a hostile or abusive working environment must be established by the totality of the circumstances." *Vaughn*, 459 N.W.2d at 633.

---

[5] When Wright complained to coworker Payne about Day's conduct, Payne responded, "Just ignore that." When she complained to coworker Kurth about the "blue eyes" comment, Kurth "chuckled" and responded, "Just ignore it." Wright stated, "[T]hat's what I started doing." She stated she began ignoring the comment in 2004, and with the exception of her complaint to Schmidt in 2004 or 2005, she made no further complaint until her resignation.

"[T]his demanding standard requires extreme conduct rather than merely rude or unpleasant conduct." *Stoddard*, 993 F. Supp. 2d at 999 (citations and internal quotation marks omitted).

We now apply the *Farmland Foods* factors from above. *See* 672 N.W.2d at 744–45 (finding frequency, severity, physically threatening and humiliating nature of conduct, and whether conduct unreasonably interfered with employee's job performance to be factors considered in whether conduct affected a term or condition of employment). Wright's complaints about Day's and Marlow's conduct were mostly limited to two occasions. Based on the record before us, though, it is clear other personnel called Wright "blue eyes" on other occasions. Considering the facts in a light most favorable to Wright, we find the name-calling was ongoing. *See id.* at 745.

We next consider whether the harassment was so severe that it unreasonably interfered with the employee's work performance. We do so using other factual scenarios as our guidepost. The court in *Duncan v. General Motors Corp.*, did not find hand touching, requests for a sexual relationship, a request that the employee make a sketch with sexual implications, putting up a poster identifying the employee as president of "Man Hater's of America" club, and asking the employee to draft a document outlining the beliefs of the "He-Men Women Hater's Club" to be severe or pervasive. 300 F.3d 928, 935 (8th Cir. 2002). The court in *Erenberg v. Methodist Hospital* held that being called "Malibu Barbie" and seeing other employees exchange backrubs and tell sexual jokes was not severe or pervasive conduct. 357 F.3d 787, 792–93 (8th Cir. 2004).

Furthermore, frequent comments on an employee's body, asking the employee out, suggesting the employee leave her boyfriend, touching her bangs, and wiping water off her pant leg was not severe of pervasive conduct in *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 551 (8th Cir. 2007). Frequent sexual comments, including those about an employee's breasts, and comments about fixing a table so that the employee could strip dance on it was found to be not severe or pervasive in *Alvarez*. *See* 626 F.3d at 420.

As Day and Marlow's conduct could be construed as involving sexually-fueled conversations, minor touching, and requests for a relationship with Wright, the conduct[6] is similar to *Duncan* and *Vajdl* and thus, not so severe or pervasive as to affect a term or condition of her employment. The "blue eyes" comments are similar to the "Malibu Barbie" comments in *Erenberg* and body and breast comments in *Vajdl* and *Alvarez.* Accordingly, the comments were not so severe or pervasive to affect a term or condition of Wright's employment.

Finally, we consider whether the conduct unreasonably interfered with Wright's job performance. The record does not indicate that any of the aforementioned conduct affected Wright's ability to do her job. Wright stated she ignored the "blue eyes" comment starting in 2004, and yet was able to perform her job until her resignation in 2010. She was able to perform her job after Day's unwelcomed conduct, and he had not worked with Wright since May 2006. As Marlow was terminated two days after Wright made the complaint and Wright

---

[6] Although nearly six years separates the conduct of Day and Marlow, for the purposes of this analysis, and to characterize the conduct most favorably to Wright, we have considered the conduct together.

had already resigned her position, there is no indication that Marlow's actions interfered with Wright's job performance.

Accordingly, we find no error in the district court finding that no genuine issue of material fact existed as to element four, and we agree with the district court that "[w]hile . . . plaintiff was at times subjected to an unwelcome and offensive nickname, and on two occasions was subjected to objectionable advances, Iowa law requires more." While Wright undoubtedly endured unprofessional and offensive comments and interactions at the hands of her coworkers and supervisors, such conduct did not affect the terms or conditions of her employment as required to establish a hostile work environment claim against Schmidt or Ross Holdings under the ICRA. *See Leichliter v. The Des Moines Register*, 617 F. Supp. 2d 818, 827 (S.D. Iowa 2009) ("More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." (citations and quotation marks omitted)); *Peda v. Am. Home Products Corp.*, 214 F. Supp. 2d 1007, 1022 (N.D. Iowa 2002) (holding that defendant's motion for summary judgment to dismiss individual defendants is denied as moot because summary judgment was granted for corporate defendants in sex discrimination claim).

## IV. Successor Liability

The doctrine of successor liability pertains to the obligation of a successor employer to remedy certain practices of his predecessor. *First Judicial Dist.*, 315 N.W.2d at 89. Because we find the trial court did not err in granting summary

judgment to Ross Holdings on Wright's hostile work environment claim, we need not consider this issue.

**V.      Conclusion**

We find no error in the district court's grant of summary judgment for Ross Holdings and Schmidt.  No genuine issue of material fact exists pertaining to the fourth element of Wright's hostile work environment claim because neither being called "blue eyes" frequently nor being subjected to one objectionable advance by a supervisor amounted to a work environment so hostile and severe that it affected a term, condition, or privilege of Wright's employment.  We do not consider Wright's successor liability claim because we did not find a hostile work environment for which Ross Holdings could be liable.  We affirm.

**AFFIRMED.**